## THE STATE *vs.* WINKLEY.

When the credit of a witness has been impeached by proof that in a certain conversation he has made statements inconsistent with the truth of his testimony, he may on his re-examination, be asked, and may state what that conversation was to which the impeaching witness referred.

In all civil actions, excepting an action for criminal conversation, evidence of acknowledgment, co-habitation and reputation is competent proof of a marriage.

But in that action, and in indictments for adultery, bigamy, &c., there must be proof of a marriage in fact.

Proof of a marriage in fact, is merely direct evidence of the marriage; and one

mode of making such proof is by the testimony of persons who were present at the ceremony.

Those circumstances which usually accompany a marriage, such as cohabitation, reputation, &c., and other facts from which a marriage may be inferred, constitute presumptive evidence of a marriage, and are commonly understood in opposition to proof by direct evidence.

A marriage was solemnized before a person who had been a preacher for twenty-five years. There was evidence that he had been ordained, but it did not appear at what time; and there was evidence that on several occasions he had united persons in marriage.—*Held,* that this was competent *primâ facie* evidence that he was an ordained minister, as required by the act of 1791.

The official acts of a minister of the gospel, coming in question incidentally, and not declared void by statute, are as valid as the official acts of other persons.

INDICTMENT, charging the defendant with having committed the crime of adultery with Betsey Welch, wife of Andrew Welch, on the 21st day of August, A. D. 1839.

To prove the marriage of Andrew Welch and Betsey Welch, the following evidence was offered on the part of the prosecution : Andrew Welch testified, that in July, 1822, he was married to Betsey Davis (now Betsey Welch,) by Elder Nathaniel Berry. He also testified that Berry was an ordained minister, but he knew that fact only from having taken Berry's deposition in a certain cause, on which occasion Berry exhibited a certificate or paper containing evidence of his ordination, and that he had been present when Berry officiated in marrying certain persons on one other occasion.

Samuel G. Berry testified that he knew said Nathaniel Berry, and that he had for many years officiated as a clergyman ; and that on one occasion, as many as sixteen years before, he knew him to unite persons in marriage. He thought he was also present on another occasion about five years since, when he united persons in marriage. That said Berry has had charge of a parish in New-Durham for the last eight or ten years, but that he did not know of his having charge of any parish before that time. He thought he had heard Berry preach as early as 1822, (but thought he preached before he was ordained,) and had known him as a preacher for the period of twenty-five years. The defendant

contended that this evidence was insufficient to prove the marriage, and requested the court so to rule and charge the jury; but the court ruled that said evidence was *prima facie* sufficient to prove the marriage, to which ruling the defendant excepted.

Noah Holmes, a witness called to support the prosecution, testified that on said 21st day of August, he saw the defendant in a certain sheep pasture, just rising from said Betsey Welch, (having been alarmed by seeing another witness,) and that the defendant and Mrs. Welch fled in different directions.

To contradict this witness the defendant called Robert Foss, who testified that in a particular conversation which he had with Holmes, on the 19th day of September, 1839, he told Holmes that he understood that he and his son had caught Winkley and Betsey Welch together, and asked Holmes whether he and his son *had* caught them together or not; that Holmes answered that *he* did not, but that his son was nearer to them than he was, and that the first he (Holmes) saw of them, they were five or six rods apart, and one of them was on one side of a fence, and the *other* on the other side. Foss also testified that he was called as a witness for the defendant on his examination before a magistrate, and there testified to the same facts. Holmes did not say to what time he referred, nor did he say that he referred to the 21st of August.

The defendant also called as a witness, David Avery, who testified that he asked Holmes whether what Foss testified to before the magistrate were true; to which Holmes answered that it was. He also called Jacob Locke, who testified that at a certain store, he, in a conversation with Holmes, asked him if he saw Winkley and Betsey Welch together; to which Holmes answered that *he* did not see them together, but that his son did; that his son was nearer to them than he was, and that he (Holmes) saw Winkley in the pasture, but that Winkley had started before he saw him. Holmes

was then re-called on behalf of the prosecution, and asked, " what did you say to Robert Foss at the time and place spoken of by Foss?" This question was objected to by the defendant; but it was ruled by the court that it was competent for Holmes to state what conversation and all the conversation he had with Foss then, and the witness gave the following answer, which was also objected to by the defendant; that he was asked by Foss if he saw Winkley and Mrs. Welch together, and he replied that there might be a flock of wild geese fly over, but that he should not know what they said; and that he then went on and told Foss a hearsay story, that on the last day of town-meeting, Winkley came to his (Holmes's) house, and took dinner; and a short time after he was gone, Holmes's son started to go over and see some sap trees, and that as he was running on the ice, Mrs. Welch discovered him, and called out to Frederick, her son; that she was then in the orchard; and that Winkley was in the sheep pasture, (which joined the orchard); that her calling out made Winkley run, and that she then started and went towards the house, and Winkley also started and went into the bushes; that Foss then asked him (Holmes) if his son saw them together, and he answered that he thought his son did not, or he would have told him of it; that Foss then asked him if *he* saw them together at that time, and he answered that he did not, for he was not as near as his son was, and that he did not tell Foss about seeing them together at any other time. Holmes was then asked the following question, which, as well as the answer, was objected to by the defendant, but admitted by the court, the court ruling that Holmes might state all the conversation he had with Avery at the time to which Avery referred; " What did you say to David Avery on the occasion testified about by him?" He answered, that he asked Avery if Robert Foss was going to alter his story, and to state that it was on the 21st of August that he (Holmes) said he did not see Winkley and Mrs. Welch together? that Avery answered

that he had heard nothing about it; that he (Holmes) then said, "Foss had better tell the truth, or he will get into the sled, for his brother Eliphalet Foss also heard the conversation;" and that he then asked Avery to find out what Foss was going to testify, and that he did not recollect saying anything about Foss's testimony being true. Holmes was then asked by the attorney general, what he stated to Jacob Locke at the time and place referred to by Locke; to which he answered, that he told Locke a story that he was mowing in his marsh and saw Betsey Welch go down into the sheep pasture singing, and that he saw a man or boy there, but that he was so far off he could not tell whether it was Winkley or not, and that he did not recollect telling Locke whether he saw anything else. The question and answer were both objected to.

The jury found the prisoner guilty, and his counsel moved to set aside the verdict, on account of the admission of the evidence excepted to.

*James Bell*, for the defendant. As to the evidence of the marriage of Betsey Welch, the defendant contends that it was insufficient, because it did not shew that Nathaniel Berry was an ordained minister of the gospel.

The state in this case did not offer or rely upon evidence of cohabitation, but attempted to show an actual marriage. The counsel for the state were undoubtedly well advised in considering evidence of cohabitation alone insufficient in a criminal prosecution. *Commonwealth* vs. *Littlejohn*, 15 *Mass.* 163; *Commonwealth* vs. *Norcross*, 9 *Mass.* 492; *State* vs. *Roswell*, 6 *Conn. R.* 446. And it is equally clear, notwithstanding what is somewhat loosely and without being called for by the case he was considering, suggested by Justice *Woodbury* in *Londonderry* vs. *Chester*, 2 *N. H. Rep.* 268, that a marriage *per verba de presenti*, not in presence of a person authorized to join in marriage, or even in the presence of such a person who does not undertake to act officially, is

not valid. See the able opinion of C. J. *Parsons*, in *Milford* vs. *Worcester*, 7 *Mass.* 48 ; *Mangue* vs. *Mangue*, 1 *Do.* 240 ; 1 *Black. Com.* 439 ; *Rex* vs. *Butler, Russ. & Ry.* 61. See, also, *Ligonia* vs. *Buxton*, 2 *Greenl. R.* 102. It is said by the attorney general, that evidence that Berry had acted as a clergyman, is sufficient.

But the only legal evidence that Nathaniel Berry was a clergyman, or was ordained as early as 1822, when this marriage is said to have been contracted, is the proof, that before that time he had preached, which is no evidence of his being ordained, it not being an act that in this state is uniformly done, or can legally be done, by ordained ministers only.

The first and only act proved to have been done by this person, which he could have done only as an ordained minister, was his joining individuals in marriage about three years after this marriage is said to have taken place, and which is no evidence of his having been ordained at the time of this alleged marriage in 1822.

Though a power once shown is presumed to continue, there is no reverse presumption that the power existed before it appears to have been exercised in any instance. 1 *Stark. Ev.* 55 ; 2 *Do.* 688.

It will be seen, therefore, that the authorities referred to by the attorney general, to the point that it is enough to shew that a party assuming to do an act as an officer, had acted as such, are inapplicable to the facts of this case.

As to the admissibility of the testimony of Holmes when called to contradict Foss, Avery and Locke, the true principle, as the defendant contends, is that laid down by Starkie and by Chitty, that when a witness is called to contradict the testimony of a former witness, who has stated that such and such expressions were used, or such and such things were said, it is the usual practice to ask whether the particular expressions were used, or those things were said, without putting the question in a general form, by merely enquiring what was said.

If this were not to be allowed, it is obvious that much irrele-vant and even inadmissible matter would frequently be detail-ed by the witness.

The most direct form of contradicting the witnesses called to prove Holmes's former declarations, would have been to have repeated to him their testimony as to his declarations, and to have asked him whether he made them ; and this, according to authorities cited, would have been the regular and proper course ; or he might perhaps have been asked what declarations he made in the hearing of those witnesses upon the subject to which their testimony related.

But he was inquired of, and permitted to testify without restriction to everything upon every subject that was stated by him in those conversations, according to his version of them.

The suggestion of the attorney general, that the witness was restricted to what was said on the point testified to by the witnesses contradicting him, is negatived by the case as drawn, and is certainly incorrect, inasmuch as the very ground upon which both the questions *and answers* were objected to at the trial was, that the witness was required and permit-ted to state portions of the conversation that did not con-tradict or explain the testimony given by Foss, Avery and Locke, but which related to different and *unconnected* sub-jects.

It is competent in many cases to inquire of a witness, whether a certain conversation, or a conversation upon a cer-tain subject, occurred, when it is improper for the witness to state what that conversation was ; and when the witness denies the conversation, it cannot be necessary or proper that he should testify to something upon a subject altogether for-eign to the inquiry, which was said at the time and place referred to. *Rice* vs. *Bancroft,* 11 *Pick.* 469.

In the *Queen's case,* 2 *Brod. & Bingh.* 297, it is said, that when the conversation of a party is proved, he has a right to have the whole of it laid before the court ; but the conversation of a witness with a third person (which is not

like that of a party, in itself evidence, but is evidence so far only as it may affect the character and credit of the witness,) stands upon a different ground.

When all that constituted the motive and inducement of the witness, and all which shews the meaning of his words and declarations, has been laid before the court, the court becomes possessed of all that can affect the credit or character of the witness, and all beyond this is irrelevant and incompetent. The question thus decided, differs in some respects from that presented by the facts in this case, but not in any particular which is material as shewing the evidence to be inadmissible. In the case referred to, the witness was reëxamined by the party calling him, in relation to a conversation stated by him upon his cross-examination. The gist of the decision is, that he could not on his reëxamination be asked, or testify, in relation to other subjects mentioned in the conversation. In the case of a witness reëxamined in answer to testimony given of his declarations inconsistent with his testimony given at the trial, the reasons for confining him within the same limits are equally strong. All the witness said could not be proved by the party who attempted to shew his contradictions, but only what he said inconsistent with his testimony at the trial. And after the impeaching testimony has been given, the witness on his reëxamination can only testify that he did not use the expressions attributed to him, or if he did use them, that he added qualifying or explanatory language. Or he may say that he remembers the conversation, (without stating it, unless required by the adverse party, as he properly may be,) and that it was upon a different subject. When the witness absolutely denies the declarations said to have been made by him, to ask him to state what remarks he did make, is necessarily to ask him to give hearsay testimony. Holmes, though the answers he was about making were objected to, was allowed to relate remarks said by him to have been made to the witness, having no relation to any thing testified to by them, and which

must have been extremely prejudicial to the defendant, con-
sisting, as they did, of inuendos, directly tending to give
color to the charge against the defendant, and which Holmes
took license from the ruling of the court to introduce, and
which the defendant could not repel by evidence, because
not sworn to as facts by any witness.   The rule of evidence,
even in the case of the declarations of a party, was in this
case violated, which is, that he can prove only such addi-
tional parts of his conversation as relate to the subject mat-
ter of the suit.

The defendant's counsel cannot but feel great confidence
that on investigation, this evidence will be found to have
been illegally received.

*Gove,* Attorney General, for the state.   As to the proof
that Elder Berry was an ordained minister, qualified to join
persons in marriage, proof that he acted and officiated as such
is sufficient.   *Dunlap* vs. *Waldo,* 6 *N. H. Rep.* 452.

In a prosecution for bigamy, the first marriage took place
in Pennsylvania, where by law marriages may be contracted
by the parties taking each other for husband and wife before
twelve witnesses, and a certificate thereof, subscribed by the
parties and at least twelve witnesses, one of them being a
justice of the peace, recorded, &c.   Held, that oral testimony
by one of the witnesses present, that the marriage was sol-
emnized according to the requirements of law, and that one
of the witnesses was reputed to be and acted as a justice,
was sufficient evidence of the facts, and that such person
was a justice of the peace; and that it was not necessary to
prove that no certificate was made, or if made, that it was
lost, or not recorded, or could not be obtained.   2 *Virginia
Cases* 95, *Warner* vs. *Commonwealth.*   See, also, *State* vs.
*Kean, Strafford County, Sup. Court, Dec. T.* 1839, (10 *N.
H. Rep.* 347,) where the objection was, 1st. Because it did
not appear that Timothy Remick, who officiated at the mar-
riage, was an ordained minister.   Witness for the state testi-

fied " that defendant, at Cornish, county of York and state of Maine, was in his presence married to Olive McKusic, on 12th Nov., 1820, by T. Remick, a resident in said town, and who long before and ever since has officiated as a minister at said Cornish," &c. ; *held*, that this evidence is sufficient. I have not a report of the case, but it will be recollected by the court. See, also, *Berryman* vs. *Wise*, 4 *D. & E.* 366, where *Buller*, J. said, " In the case of all peace officers, justices of the peace, constables, &c., it is sufficient to prove that they acted as such, without proving their appointment, and that even in cases of murder. See, also, 2 *N. H. Rep.* 202, *Johnston* vs. *Wilson*, and 1 *N. H. Rep.* 263, *Jones* vs. *Gibson*, and the cases there cited ; 2 *N. H. Rep.* 276, *Londonderry* vs. *Chester*.

A marriage *de facto* must be proved. *Elizabeth Sears'* case, 1 *City Hall Record* 111 ; *People* vs. *Humphrey*, 7 *Johns.* 314 ; 1 *Wheeler's C. C.* 115, *People* vs. *Whigham* ; *Commonwealth* vs. *Littlejohn*, 15 *Mass.* 163.

But marriage *de facto* means only proof of the marriage ceremony, as contradistinguished from cohabitation and reputation. *People* vs. *Whigham*, 1 *Wheeler C. C.* 115.

If a witness has been impeached by shewing that he has given a different account of the transaction upon a former occasion, he may be supported by shewing that he has also given accounts consistent with his present testimony. *Coffin* vs. *Anderson*, 4 *Blackford* 395 ; *People* vs. *Vane*, 12 *Wend.* 78.

This principle, it is believed, is too well established to need farther references. If, then, I could give other evidence to explain the conversations which Holmes had with the defendant's witnesses, and to show that they misunderstood it, or misrepresented it, I could call Holmes to do the same thing. Suppose I had denied that Holmes ever had any conversation with Locke ; could I not offer evidence to shew the fact, and thus to impeach Locke ? So if I knew that Locke had omitted an important part of the conversation he had with Holmes, could I not call Holmes, or any other witness,

to supply the omission in Locke's testimony, both for the purpose of impeaching Locke's accuracy, and also to give the jury a fair understanding of the facts, and the whole facts? See *Roscoe on Crim. Ev. p.* 157, *Title, Re-examination.*

The case states that Holmes being called again, the attorney general put this question: "What did you say to Foss at the time of which he speaks"? (and the same to the other witnesses.) To this the defendant objected. The court, according to my recollection, ruled that I might put in all the conversation which Holmes had with the defendant's witnesses, at the times testified to by them, touching the subject of which the defendant's witnesses spoke; and this rule is supported by *Roscoe,* and the authorities there cited. So if we take the case as we find it drawn up by Mr. *Bell,* (although differing somewhat from the facts as I recollect them,) still the law is clearly against him.

GILCHRIST, J. The facts stated in this case, render it necessary to inquire how far a witness whose testimony has been impeached by evidence that he has made contradictory statements in relation to the same transaction, may be permitted, on his reëxamination, to give *his* statement of the conversations in which the contradictions of his present testimony are said to have been made. Holmes, a witness for the state, testified to a certain transaction. The prisoner then introduced three witnesses, Foss, Locke and Avery, whose testimony tended to prove that Holmes had given accounts of that transaction inconsistent with the truth of his testimony. All these witnesses related conversations between themselves and Holmes. Holmes was then re-called by the attorney general, and was asked what he said to Foss, to Locke, and to Avery, on the several occasions to which their testimony referred. This was objected to, but was permitted by the court to be put, the court ruling that Holmes might state all the conversation he had with these witnesses,

at the times to which they referred. To this ruling the pris-
oner excepts. Holmes was re-called because his testimony
had been impeached. Three witnesses had testified that in
certain conversations he had made certain statements. Upon
these points, therefore, he was entitled to be heard, either by
way of express denial that he had made the statements, or
by explaining or qualifying them. Their effect upon his cred-
ibility might have been destroyed by evidence that they were
made in an ironical manner and tone, by showing that they
were connected with other remarks in such a way that they
ought not to impair his credit, or that he could not have been
supposed to be serious in making them. The purpose of the
counsel's argument is, to show that Holmes should have
been confined to an admission or a denial of the statements
he was charged with having made, and consequently that he
should not have been allowed to state all the conversation he
had with the impeaching witnesses on the occasions to which
they referred; and he cites the *Queen's case*, 2 *Brod. &*
*Bingh*. 298, as an authority for this position. In that case
a distinction is made between a conversation by a witness
with a party to a suit, and a conversation with a third per-
son. The reason given is, that the conversation of a party
is evidence against him in the suit, and the whole of it ought
to be given, because it would not be just that a part of it
should be used against him, without giving him the benefit
of the residue. But the conversation of a witness with a
third person, is evidence, only as it may affect the character
and credit of the witness, which may be affected by his an-
tecedent declarations, and by the motive under which he
made them; "but when once all which had constituted the
motive and inducement, and all which may show the mean-
ing of the words and declarations, has been laid before the
court, the court becomes possessed of all which can affect
the character and credit of the witness, and all besides this
is irrelevant and incompetent." The question before the
court was not like the one now before us. It was not whether

a witness who had been impeached by evidence of his contradictory statements could relate the whole of the conversation in which those statements were alleged to have been made, but whether, when a witness for the prosecution, who on his cross-examination states that he told A. that he was one of the witnesses against the defendant, and upon his reexamination states what induced him to mention this to A., may be further reëxamined as to such conversation. It was held that he could not be further reëxamined, even so far as the conversation related to his being one of the witnesses. It was also held, that a counsel had a right, upon reëxamination, to ask all questions which may be proper to draw forth an explanation of the sense and meaning of the expressions used by the witness on the cross-examination, if they be in themselves doubtful, and also of the motive by which the witness was induced to use those expressions, but that he had no right to go farther, and to introduce matter new in itself, and not suited to the purpose of explaining either the expressions or the motives of the witness. The effect of this decision is to sustain the ruling of the court. The object of the questions to Holmes upon the reëxamination was, to procure an explanation of the sense and meaning of the expressions attributed to him by the impeaching witnesses. The meaning and effect of the expressions must depend on the connection in which they were used. If, in stating the conversation, he admitted having used them, but explained them by the context, the case would fall clearly within the principle stated in the case referred to. If in stating what he says was the whole of the conversation, he repeats no expressions of the kind, then he makes a denial in substance of having used the expressions in question. But when a witness is impeached by evidence that in a certain conversation he has made statements inconsistent with his present story, we are not aware of any principle that should prevent us from permitting him in the first instance to relate that conversation. This would give him the opportunity of

explaining them. If in his relation he state none of the alleged expressions, he may then be asked the question distinctly, whether he did or did not make the statements testified to by the contradicting witnesses. In the subsequent case of *Prince* vs. *Samo*, 7 *Ad. & E.* 627, Lord *Tenterden's* opinion, which was that of the court, was denied. Lord *Tenterden* said that a witness might be reëxamined, not only as to so much of his former testimony as may explain or qualify the matter introduced by the previous examination, but even matter not properly connected with the part introduced on the previous examination, provided, only, that it relate to the subject matter of the suit. This was said by Lord *Denman*, to be extra-judicial in the case in which it was stated, and not to rest on any previous authority; and the distinction made in the *Queen's case*, between the conversation of a witness and that of a party, seems also to be overruled. But we see nothing in either of the cases that conflicts with the competency of Holmes's testimony as stated in the case. The inquiry, in relation to each of the three witnesses, was limited to the particular conversations to which they alluded, and the only point we intend to decide is, that when the credit of a witness has been impeached by proof that in a certain conversation he has made statements inconsistent with the truth of his testimony, he may on his reëxamination state what that conversation was. We are not aware that any direct authorities are to be found on this matter, and we are led to this conclusion by a regard for what, as it seems to us, the interests of truth and justice require. This view of the case, and it appears to us to be a sound one, avoids the objection which exists to proving that the witness has made statements at other times similar to his testimony, and thus fortifying his testimony by his declarations made out of court. The cases in New-York which recognized the competency of such declarations, were overruled in *Dudley* vs. *Bolles*, 24 *Wend.* 465. And such dec-

larations are not now received in England. *Rex* vs. *Par-ker*, 3 *Dougl.* 242, 244.

The other question in the case relates to the evidence of the marriage. In civil actions, evidence of cohabitation, reputation, &c., is sufficient; but in indictments for bigamy, and in actions for criminal conversation, there must be proof of an actual marriage. *Morris* vs. *Miller*, 4 *Burrow* 2059; *Birt* vs. *Barlow*, *Dougl.* 171. In this case there was a marriage in fact. Andrew Welch, the husband of Betsey Welch, testified that he was married to her in the month of July, 1822, and for this purpose he was a competent witness. There must be proof of the identity of the party, even if a copy of the record be produced. *Wedgewood's case*, 8 *Greenl.* 75; *The State* vs. *Wallace*, 9 *N. H. Rep.* 515; *Commonwealth* vs. *Norcross*, 9 *Mass.* 492. In *The State* vs. *Kean*, 10 *N. H. Rep.* 347, on the trial of an indictment for bigamy, evidence was offered that the prisoner was married to one Olive McKusic, by Timothy Remick, a resident in the town of Cornish, in Maine, who had for some time officiated as a minister at Cornish, where the marriage took place. It was objected that the evidence did not prove that the marriage was solemnized by any person authorized to do so by the laws of this state. But it was said by the court that the exception could not prevail. "There was a marriage in fact, and that is sufficient."

It does not appear to be laid down what is a marriage *in fact.* In *Morris* vs. *Miller*, 4 *Burr.* 2059, Lord *Mansfield* says, "we do not at present define what may or may not be evidence of a marriage *in fact.*" In that case he had just said that "in an action for criminal conversation, there must be evidence of a marriage *in fact;* acknowledgement, cohabitation and reputation, are not sufficient." Upon the argument, and before the judgment of the court was pronounced, he had said, "proof of actual marriage is always used and understood in opposition to proof by cohabitation, reputation, and other circumstances from which a marriage may be in-

ferred." In the subsequent case of *Birt* vs. *Barlow, Dougl.* 174, Lord *Mansfield* said, that registers were in the nature of records, and need not be produced, nor proved by subscribing witnesses. " A copy is sufficient, and is proof of a marriage in fact, between two parties describing themselves by such and such names and places of abode, though it does not prove the identity." In *Henmings* vs. *Smith,* 4 *Dougl.* 33, which was an action for *crim con,* Lord *Mansfield* said, speaking of the proof of the marriage, " reputation will not do for that purpose ; a marriage in fact must be proved."

Proof of a marriage, then, may be made in various ways, according to the nature of the proceeding in which the proof is required. In all civil actions, excepting that for criminal conversation, it may be inferred from those circumstances which generally accompany a marriage, such as acknowledgement, reputation, cohabitation, &c. But in criminal prosecutions, like indictments for bigamy, adultery, &c., *direct* evidence of the marriage is required, and this may appear from the testimony of witnesses who were present at the ceremony. This constitutes proof of a marriage *in fact,* and is merely *direct* evidence of the marriage, as contradistinguished from cohabitation, &c., which is *indirect* evidence of the marriage.

The marriage now in question was solemnized before Elder Nathaniel Berry. The evidence showed that he had been a preacher for twenty-five years. It did not appear when he was ordained, but he had united persons in marriage as many as sixteen years ago, at the time of the trial, which was in August, 1841. One of the witnesses had seen a certificate containing evidence of his ordination. We are of opinion that this was competent evidence *prima facie,* that he was an ordained minister, as required by the act of 1791, *N. H. Laws* 172, *Ed. of* 1830, at the time the ceremony was performed, in July, 1822. In *Londonderry* vs. *Chester,* 2 *N. H. Rep.* 276, it is said by the court, "the minister in this case was an acting minister; he was in the

habit of performing ministerial duties; he witnessed this contract of marriage in his official capacity, and whatever may have been his want of qualification, we have before seen that by our statute it is punished only by a penalty, and the marriage is in no case declared void." It has been held in Connecticut that a clergyman, in the administration of marriage, is a public officer, and his acts as such, in the celebration of marriage, are admitted as *prima facie* proof of his qualifications, without higher evidence. *Goshen* vs. *Stonington*, 4 *Conn. R.* 209. There seems, indeed, to be no reason why the acts of a minister, coming in question incidentally, and not declared to be void by statute, should not be considered valid as well as the official acts of an inspector of the revenue, a deputy sheriff, or an attorney. *Jones* vs. *Gibson*, 1 *N. H. Rep.* 268; *Johnston* vs. *Wilson*, 2 *N. H. Rep.* 205; *Berryman* vs. *Wise*, 4 *T. R.* 366.

*Judgment on the verdict.*