[Crim. No. 16. In Bank.—August 27, 1895.]

THE PEOPLE, RESPONDENT, v. WILLIAM RYAN, APPELLANT.

CRIMINAL LAW—MURDER—JURY—SPECIAL VENIRE—BIAS OF SHERIFF.—
 A deputy sheriff is not disqualified, under section 1064 of the Penal Code, from summoning a special venire of jurymen in a trial for murder merely because he believed that the defendant had committed the homicide, if he had no opinion as to whether or not the killing was justifiable, there being no real contention in the case that the defendant did not do the killing.

ID. —TRIAL OF CHALLENGE TO PANEL—EXAMINATION OF SHERIFF AS TO BIAS.—On the trial of a challenge to the panel, on account of the bias

of the officer who summoned them, it is not improper, under section 1076 of the Penal Code, to ask such officer whether, if he were impaneled and sworn as a juror to try the case, he could and would give the defendant a fair and impartial trial, notwithstanding such officer did not base his opinion upon public rumor or newspaper statements.

Id.—Evidence—Feeling of Witness.—A witness for the state, who had been previously prosecuted for killing the father of the defendant on the occasion at which the defendant committed the homicide for which he was being tried, cannot be asked, for the purpose of showing his feeling as a witness, whether on such previous trial he had employed counsel to defend himself.

Id.—Impeachment of Witness.—In laying the foundation for the impeachment of the defendant, the prosecution asked a witness whether he was acquainted with the defendant's general reputation in the community where he lived "for truth, honest, or integrity." The defendant made no objection to the form of this question, but did object to the following question asked the witness as to what such reputation was. The court overruled the objection. Held, that as the court's attention had not been called to the technical defect in the form of the first question, in the use of the word "or" for "and," and as the defendant had ample opportunity on cross-examination to find out what qualities the witness was testifying about, the ruling was not erroneous.

Id.—Improper Conduct of Prosecuting Attorney. — The attorney for the prosecution should not ask inadmissible questions for the purpose of exciting suspicions in the mind of the jurors prejudicial to the defendant, nor repeat a question to which an objection has been sustained, nor, during the trial, make remarks unjustly injurious to the defendant.

Id.—Conflict of Evidence—Appeal.—Where the evidence as to whether a homicide was justifiable or not is conflicting a judgment of conviction of murder in the second degree cannot be interfered with on appeal.

Appeal from a judgment of the Superior Court of Kings County and from an order refusing a new trial. Justin Jacobs, Judge.

*Maurice E. Power*, and *Rowen Irwin*, for Appellant.

*Attorney General W. F. Fitzgerald*, and *Deputy Attorney General Charles H. Jackson*, for Respondent.

McFarland, J.—Appellant was accused by information of the murder of one James McCaffery, and was convicted of murder in the second degree. He appeals from the judgment and from an order denying his motion for a new trial.

1. The first alleged error relied on for a reversal is the refusal of the court to allow the challenge of appel-

lant to the panel of jurors summoned on a special
venire, upon the ground that the deputy sheriff who
summoned said jurors was disqualified under section
1064 of the Penal Code.

Under the circumstances shown by the testimony on
this point, it would have been, perhaps, more becoming
in the sheriff to have selected some person other than
the deputy in question to summon said jurors; but we
cannot say that the court erroneously decided, on the
evidence, that the said deputy was not disqualified by
bias. It is true that in one part of the testimony of the
deputy when on the witness-stand he did give an affirm-
ative answer to the question whether or not he had
an opinion as to the guilt or innocence of the appellant;
but he afterward said: " I have not formed or expressed
any opinion as to the guilt or innocence of this defend-
ant. I have no bias or prejudice against him. . . . .
I say that I had some sort of opinion, but it has since
been dispelled. . . . . I simply had an opinion that
McCaffery had been killed. As to whether or not he
had been killed in a justifiable manner, or whether the
party who took his life was justifiable or not, I had no
opinion, and never have had. I have no opinion now."
In answer to the question, " Have you any opinion now
of any kind or character, or have you had *since the next
day after the trouble,* as to the guilt or innocence of this
defendant," he answered, " No, sir." He also said: " I
mean that I had an opinion that he [defendant] was
the man that shot McCaffery; whether he was justified
in it or not I don't know." (There was no real conten-
tion in the case that appellant did not kill McCaffery;
but he was killed by a shot aimed by appellant at
one George McCord, which shot appellant claims he
was justifiable in firing.) Looking at all the evidence
we cannot see that the denial of the challenge was erro-
neous. As the witness did not base whatever opinion
he may at one time have had upon public rumor or
newspaper statements, as mentioned in section 1076 of
the Penal Code, it is contended by appellant that the

court erred in asking him this question: "If you were impaneled and sworn as a juror to try this cause, could you, and would you, give the defendant a fair and impartial trial?" But the provisions of section 1076 do not make it *improper* to ask that question in any case when the court is endeavoring to find out the real state of the juror's mind.

2. On the occasion at which the appellant killed McCaffery the appellant's father, James O. Ryan, was killed by one of the party called by some of the witnesses the McCord faction; and when George B. McCord was a witness for the prosecution appellant's counsel, on cross-examination, asked him this question, "Did you employ an attorney to defend you with reference to the action that you took in the killing of James O. Ryan?" an objection by the prosecution to this question was sustained, and this is claimed by appellant to have been error. We do not think that this ruling was erroneous. If he had been asked, "Did you employ counsel to prosecute the defendant?" the question would have been proper, as showing his feeling as a witness; but employing counsel to defend himself on another charge would be an act not relevant to the case on trial.

3. The prosecution called several witnesses to impeach the appellant and one of his witnesses; and each of them was asked this question, "Are you acquainted with his general reputation in the community where he lives for truth, honesty, or integrity?" No objection was made to this question; but, the witness having answered in the affirmative, he was then asked, "What is it, good or bad?" and to this second question appellant objected, and his objection was overruled. Appellant's contention here is that the second question was improperly allowed, because the said first question was in the disjunctive, the word "or" having been used between "honesty" and "integrity." It does not appear that the attention of the court below was called to the form of the first question, the objection to the second question being merely that it was "irrelevant, immaterial, and incompetent,

and that no proper foundation was laid therefor." If, when the second question was asked, the attention of the court had been called to the fact that the first question was in the disjunctive, the attorney for the prosecution would probably have been required to state which, or how many, of the characteristics mentioned in the first question he was inquiring about. Moreover, appellant could not have been prejudiced by the mere form of the question, for he had ample opportunity upon cross-examination to find out what qualities or characteristics the witnesses were testifying about; and the whole matter is too unimportant to warrant a reversal of the judgment.

4. Appellant contends for a reversal on account of misconduct of counsel for the prosecution. This contention of appellant is certainly not frivolous; for the conduct of counsel for the people in some of the instances pointed out by appellant is, at least, censurable. An attorney for the people should not ask inadmissible questions for the purpose of exciting suspicions in the minds of the jurors prejudicial to the defendant; nor repeat a question to which an objection has been sustained; nor, during the progress of the trial, make remarks unjustly injurious to the defendant. Such conduct prevents a defendant from having that fair trial to which, whether really innocent or guilty, he is entitled. Moreover, it may defeat the punishment of crime by jeopardizing a conviction when the defendant is clearly guilty. Some allowance, however, must be made for the infirmity of human nature as exhibited by counsel in the heat of a trial, and in the case at bar, while, as before stated, the conduct of counsel was not free from blame, yet we do not think that it was of such gravity and importance as to warrant a new trial. The facts are not nearly on a level with those upon which the judgment was reversed in *People* v. *Wells*, 100 Cal. 459, or in the other cases referred to in the opinion of that case.

5. The gravest question in this case is whether the evidence warranted a conviction of murder.

The homicide occurred at a primary election held in a schoolhouse. Appellant's father, J. O. Ryan, who was a small man, over fifty years old and a permanent cripple, was one of the officers of the election. The appellant, who was between twenty-one and twenty-two years old, and at the time also a cripple on crutches, was the second person offering to vote. There were present three of the McCord family and McCaffery, who was a son-in-law of one of them. We infer from the evidence, although it does not expressly appear, that there was something of a feud between the McCords and McCaffery on the one side and the two Ryans on the other. When appellant offered to vote one of the McCords challenged his vote upon the ground that he had sworn some time before, at an election in the city of Hanford, that he resided there, and demanded that he be sworn. His father directed him to swear his vote in, and he said he would do so. At that juncture the McCords charged appellant with perjury. As to the exact language used, and as to how many joined in the charge, the testimony is conflicting. George McCord testified that he himself said: "Yes, I don't think that you have any regard for your oath, and I believe that you would swear to any thing." Other witnesses swore to much rougher language. In reply to the remark of George the appellant called him a liar, there also being a conflict as to the exact language used by him; George then advanced toward appellant, who, George says, had raised his crutch above his head, and had advanced as if he intended to strike. This the appellant denies. Before George had advanced more than a step or two he was caught by a man named Beckerlie, and for a few moments George and Beckerlie engaged in a tussle, which resulted in both falling on the floor among the school desks. In the mean time another of the McCord party had struck appellant over the head with one of his crutches with such force as to break the crutch, and another had knocked the father, J. O. Ryan, down for the alleged reason that he had put his hand toward his hip pocket, and it was sup-

posed that he was about to draw a pistol.   J. O. Ryan was struck and kicked several times, and was very roughly handled.   The appellant, after quite a fight with others of the party, finally got out of the schoolhouse, having freed himself from McCaffery, who was on his back, by rubbing against the casing of the door.   When appellant got out of the house he went to his wagon, which stood a short distance away, and, getting a pistol from under the cushion, returned to the front of the house. At this time J. O. Ryan was outside of the house.   Appellant testified that as he approached the house from the wagon a shot was fired frôm the house, and that his father told him that he was shot, and that George Mc-Cord had shot him, and for him (appellant) to shoot and " pop it " to George McCord.   Several shots were then interchanged between appellant from the outside of the house and George McCord from the inside, or at the door.   One of appellant's shots penetrated some part of the woodwork of the building, and killed McCaffery. One of George McCord's shots hit J. O. Ryan, making a wound which caused his death a day or two afterward. There is a great conflict of testimony as to whether the first shot was fired *from* the house by McCord, or *at* the house by appellant.   George McCord testified that he heard shots before he got loose from Beckerlie; that he heard McCaffery say that he was shot before he went to the door; that he went to the door after three shots had been fired from the outside, and saw appellant raising his pistol to fire again; that he (George) after getting to the door fired his first shot at appellant; that he then saw J. O. Ryan with a pistol in his hand, and heard him telling appellant to fire; and that he (George) then fired at J. O. Ryan.   Soon afterward appellant and J. O. Ryan went away.   There is a conflict of evidence as to whether or not J. O. Ryan had a pistol at any time during the melee.

The foregoing is a mere skeleton statement of the affray; the filling up would be an immense quantity of conflicting testimony on many material points.   An ex-

amination of the mere cold, lifeless transcript tends to leave a doubt in the mind as to whether or not appellant was properly convicted, or whether, at the most, he was guilty of any crime higher than manslaughter. If, as he returned from the wagon, knowing how his father had been treated in the house, a shot was fired from the house, and he was told by his father that he was shot, he had reasonable grounds for believing that the life of his father and himself was in danger, and he had the right to defend either. If, however, when he returned from the wagon, the affray was over; if no shot was fired from the house until after he had himself shot; and if his father and himself could have walked away without further danger, and he shot out of revenge, then he was guilty. The determination of these questions depended upon a variety of absolutely contradictory evidence given by numerous witnesses; and, in such a case, the conclusions of the jury and of the judge who refused a new trial must be taken as final. They not only had better opportunities than we have to pass upon the credibility of witnesses and to weigh the evidence, but it is their exclusive province to do so, under the law, when there is a mass of evidence to both sides of an issue. We could not rightfully set aside a verdict merely on account of a doubt which we might have of its correctness; we could set it aside only when it clearly appeared to us to be wrong, and this we cannot say of the verdict in the case at bar.

Judgment and order affirmed.

GAROUTTE, J., HARRISON, J., TEMPLE, J., and VAN FLEET, J., concurred.