[Crim. No. 1403. In Bank.—May 19, 1909.]

THE PEOPLE, Respondent, v. EMMA Le DOUX, Appellant.

CRIMINAL LAW—MURDER—SUPPORT OF VERDICT.—*Held,* that the evidence in this case is amply sufficient to support the verdict against the defendant, convicting her of the crime of murder in the first degree for the killing of her husband by the administration of poison.

ID.—IMPANELING OF JURY—ERROR IN OVERRULING CHALLENGE TO PANEL—DISQUALIFICATION OF SHERIFF FOR ACTUAL BIAS.—It was error to overrule a challenge to the panel of a jury for disqualification of the sheriff for actual bias in summoning the same, where it appears that he had an unqualified opinion of the guilt of the defendant, based upon his own activity in gathering evidence for the prosecution and founded upon his direct investigation of the facts.

ID.—SHERIFF IN SAME POSITION AS A TRIAL JUROR AS TO ACTUAL BIAS.—Under section 1064 of the Penal Code, the sheriff in summoning a jury panel is subject to the same challenge as to actual bias which would be good ground for challenge to a juror; and when he has formed an unqualified opinion of the guilt of the defendant based upon his own knowledge of the evidence for the prosecution, he is absolutely disqualified to summon the panel.

ID.—INSUFFICIENT TESTIMONY.—The testimony of the sheriff or of a juror, that notwithstanding the unqualified opinion so formed, he could and would act fairly and impartially, is utterly without substance or weight.

Id.—Disqualification of Sheriff Affecting Deputies.—Though a deputy sheriff may be personally disqualified for actual bias, without affecting the sheriff, yet when the sheriff is so disqualified, his disqualification affects all of his deputies, though they may not be personally disqualified. The order directing the summoning of any panel addressed to the disqualified sheriff cannot be executed by a deputy not personally disqualified, for the manifest reason that the deputy can only act in the name of the sheriff, and his act is the act of the disqualified sheriff.

Id.—Rule as to Exhaustion of Peremptory Challenges of Jurors Inapplicable to Challenge to Panel.—The rule that an appellate court will not review a challenge imposed to an individual juror, if it shall be made to appear that the jury was completed without the exhaustion by defendant of all his peremptory challenges, does not apply to the case of a challenge to the panel because of the bias of the sheriff.

Id.—Effect of Challenge to Panel for Bias of Officer.—When a challenge to the panel is made for the bias of the summoning officer, every man summoned is obnoxious to the law, and is in law a disqualified juror.

Id.—Duty of Trial Court to Determine Qualifications of Summoning Officer in Advance.—It is the duty of the trial court to determine the qualifications of the summoning officer before ordering him to summon a special venire. If the court knows the sheriff to be disqualified he should appoint the coroner or an elisor whom he finds to be qualified, as the case may be, and to avoid the unnecessary delay and expense from the summoning of a jury by an officer who is disqualified.

Id.—Evidence of Motive—Letters Illegally Obtained—Affection Shown for Bigamous Husband.—Notwithstanding letters of the defendant showing affection for a bigamous husband were illegally obtained from his residence during his absence and that of defendant, without warrant or authority and in violation of the constitutional provisions against unreasonable searches and seizures, they were not for that reason inadmissible as tending to show a motive for the crime, in connection with evidence tending to show that such relations could not be longer concealed from the deceased.

Id.—Evidence Showing Belief of Former Marriage with Deceased.—Evidence tending to show the belief of the defendant that she had formerly legally married the deceased, and as bearing upon her motive to commit the crime, consisting of her declarations as to such marriage, of their cohabitation and repute as husband and wife, and of an original marriage license issued to them in Arizona with the certificate of a purported clergyman endorsed therein, certifying the solemnization of a marriage between them, to which were appended their signatures as groom and bride, was admissible for that purpose, though such evidence could not prove bigamy

without proof of the ministerial character of such clergyman and his authority to solemnize the marriage. But it was not incumbent upon the prosecution to prove bigamy, the truth of the matter upon which defendant's belief was founded being inconsequential.

ID.—ERROR IN REFUSING TO PERMIT DISPROOF OF MOTIVE—ILLICIT RELATIONS WITH DECEASED—HOUSE OF PROSTITUTION.—The court erred in refusing to permit the introduction of offered testimony by the defendant to prove that her relations with the deceased were illicit, that she had been placed in a house of prostitution by him and that he lived off of her earnings as a common prostitute. Such evidence was admissible, its weight being a question for the jury. Where marriage is asserted by one party and denied by the other, and where the motive of the crime is sought to be established before the jury, the whole of the conduct, life, and character of the parties, as affecting this question, is open to inquiry.

ID.—REFUSAL OF REQUESTED INSTRUCTIONS AS TO PRESUMPTION OF INNOCENCE.—Where the instructions requested by defendant as to the presumption of innocence go farther than is warranted by the law, in declaring that the presumption of innocence is the only presumption allowable in a criminal case, and is not overcome by any other presumption, but overcomes all other presumptions of whatsoever kind or nature, they were properly refused. Conclusive presumptions are not overcome by the presumption of innocence, nor are many disputable presumptions so overcome.

ID.—REQUEST AS TO BURDEN OF PROOF TO SHOW FORMER MARRIAGE NOT ANNULLED.—A requested instruction placing the burden upon the prosecution to prove that the former marriage between defendant and deceased had not been annulled before the second marriage with the deceased was properly refused, it only being necessary to prove that defendant believed that she had been married to deceased and that the marriage had not been annulled when the second marriage was contracted.

ID.—ERROR IN FORM OF QUESTIONS TO EXPERTS BASED UPON HEARSAY TESTIMONY—CAUSE OF DEATH—HYPOTHETICAL QUESTIONS PROPER. —It was erroneous to base the opinion of expert witnesses upon the testimony heard by them, as to the cause of the death of the deceased. The proper method was to base their opinion upon hypothetical questions, so that it can be clearly established upon what the opinion is based, which cannot be done by the method pursued when it does not clearly appear that the facts heard are simple, salient, and few, and not complicated or disputed.

APPEAL from a judgment of the Superior Court of San Joaquin County and from an order denying a new trial. W. B. Nutter, Judge.

The facts are stated in the opinion of the court.

Charles H. Fairall, for Appellant.

U. S. Webb, Attorney-General, J. Charles Jones, and George F. McNoble, District Attorney, for Respondent.

HENSHAW, J.—Defendant was indicted for the murder of Albert N. McVicar. Upon trial she was found guilty of murder in the first degree and the death penalty was imposed. From the judgment and from the order denying her motion for a new trial she prosecutes her appeal.

It is not contended that the evidence is insufficient to sustain the verdict and judgment, but complaint is made of the ruling of the court upon challenge to the panel of jurors, of certain of its rulings in admitting and refusing to admit evidence, and of other rulings refusing to give instructions proffered by the defendant. To the better understanding of these questions, the facts which the prosecution undertook to establish, require brief narration. Evidence was offered to show that the defendant married Albert N. McVicar, the deceased, in Bisbee, Arizona, in 1902. Thereafter she separated from him and lived more or less continuously with her mother near Jackson, Amador County, California. In August, 1905, she went with one Eugene Le Doux, who resided near her mother's home in Amador County, to Yolo County, where a marriage license was procured and the two were married before a justice of the peace. After this marriage to Le Doux she returned with him to her mother's house, where they lived together as man and wife. Upon March 11, 1906, she met McVicar by appointment at Stockton, California. McVicar was employed as a timberman in a mine at Jamestown, was about thirty-seven years of age, weighed about one hundred and eighty-five pounds, was vigorous and in good health. Defendant and McVicar engaged a room at the California Hotel at Stockton and remained there one night, McVicar registering, in the presence of the defendant, as "A. N. McVicar and wife." The next day the two went to a furniture store in Stockton, purchased household furniture, gave their residence as Jamestown, and ordered the furniture shipped to that place. That day or the next day they went to San Francisco, and from San Francisco the furniture company in Stockton received a telephone message from the defendant,

asking if the furniture had as yet been shipped to Jamestown, and stating that if it had been it was to her regret, as she desired to make other shipping arrangements. On the fifteenth day of March the defendant and McVicar left San Francisco and traveled to Jamestown, spending the night at one of the hotels, where again they were registered by McVicar as "A. N. McVicar and wife." On the following day McVicar resumed his work at the mine. The defendant informed the friends and acquaintances of McVicar that they had come to Jamestown to reside, and the two visited houses located near the mine with the apparent purpose of selecting a residence. The furniture which they purchased had arrived and was at the depot. McVicar continued in his employment until Wednesday, the twenty-first day of March. At that time he ceased work and drew from the company all the money due him, amounting to $163. The two left Jamestown together by train on the morning of March 23, 1906, which was Friday, and went to Stockton, reaching the city just before the noon hour. They gave as a reason for their change of plans that defendant had represented to McVicar that her mother in Amador County would employ and pay him better wages than he was receiving; that he was to aid in farming operations, and in driving or superintending the driving of her mother's teams. About two o'clock in the afternoon of the day of their arrival at Stockton they went again to the furniture store to make substitutions for furniture which they had purchased, stating that because of a change in their plans many of the articles which they had selected would be of no use to them. The proposed exchanges were agreed to by the furniture company, and McVicar in the presence of the defendant, said that the articles were to be shipped to Amador County, and upon the suggestion of the defendant gave the consignee's name as Eugene Le Doux, "my brother-in-law." After transacting this business the two went again together to the California hotel, again registered as "A. N. McVicar and wife" and were assigned to the room which they had previously occupied. They were seen going in and out of the building together upon the afternoon and evening of that day. McVicar appeared on the streets at half-past eight o'clock in the evening and purchased two or three flasks of whiskey at a neighboring saloon. The two were in the room at nine fifteen o'clock, and their light

was burning as late as half-past twelve o'clock. Early on the following morning, which was Saturday, the defendant was seen by several persons in a corridor of the hotel. At about ten o'clock in the morning she went to a store about half a block from the hotel and purchased a trunk, for which she paid, giving directions to have it sent to the California hotel and to room 97, which was the room she and McVicar had been occupying. Soon after this she went again to the furniture company and discussed the matter of the exchange of the goods which had been purchased. She spent about an hour in the store looking over different articles and purchased several. She left the store about half-past eleven. A few minutes thereafter she entered another store, where she purchased a rope, stating that she wanted to use it to bind a heavy trunk in which she intended to ship some dishes. This rope she carried away with her. From there she went to an express stand upon the street and engaged an expressman, sending him to the depot to bring a suit case, and enjoining him to make haste as, upon his return, she would have a trunk for him to take to the one o'clock train. The trunk had been delivered at room 97, but, the door being locked, it was left standing in the hall. The expressman obtained the suit case and in like manner and for the same reason left it in the hallway. At about fifteen minutes past twelve the defendant appeared again at the stand of the expressman and told him that she could not be ready to take the one o'clock train, asking him to come at two o'clock and get the trunk. She then went to a millinery store, purchased and paid eight dollars for a hat, next, to a dry-goods store, where she purchased and paid for articles of wearing apparel to the value of $15.75. In the store she stated that it was necessary for her to go to San Francisco but that she would return by the first train in the morning, as her husband was coming down from Jamestown to meet her. About two o'clock in the afternoon she sent a telegram to one Joseph Healy in San Francisco, asking him to meet her upon the train's arrival. About the same time the expressman went to the California Hotel and, assisted by another man, took the trunk which was in room 97, the trunk being packed, fastened it with the rope which was lying in the room, carried it to his wagon and delivered it at the Southern Pacific depot. The defendant had gone to the depot

before the expressman arrived and had displayed considerable
uneasiness over the fact that her baggage had not come, and
undertook to telephone to the California Hotel concerning it.
It was at this time that the expressman came in sight and
she abandoned her effort to telephone. The expressman deliv-
ered the trunk and the suit case in the baggage room of the
depot and went away. The trunk was placed on one of the
baggage trucks of the company and remained there for about
an hour, until the four o'clock train reached the station. It
was put into the baggage car of that train. It was then dis-
covered that the trunk bore no check or other identification
mark. Upon this discovery it was put back upon the truck,
where it remained until five or six o'clock in the afternoon.
It was then carried into the baggage room, where it remained
until about half-past eight o'clock in the evening. In moving
the trunk the suspicions of the baggageman were excited by
a peculiar thumping noise which came from it when it was
turned over or on end. One of the baggagemen, who had
been in that employment for fourteen years and had handled
dead bodies every week, smelled at the lock of the trunk and
detected an odor which he believed to be that of a human
body. The chief of police and the district attorney were
sent for, and the trunk was opened. Inside of the trunk was
found the body of Albert N. McVicar. The body was entirely
dressed except for the absence of a coat and shoes. An
autopsy was performed that evening and from a visual inspec-
tion every vital organ appeared in a normal and healthy
condition, and there were no external wounds of consequence
and no evidence of the use of any irritant or corrosive poison.
Certain portions of the various organs of the body, including
the bladder holding the urine, were removed for further exam-
ination. These parts were taken to San Francisco and there
analyzed by a chemist, whose examination revealed the pres-
ence of morphine in quantity more than sufficient to have
caused death. The defendant took the four o'clock train from
Stockton to San Francisco, and remained in San Francisco
at a hotel registered under the name of M. T. Williams.
Joseph Healy met her in San Francisco. The next day she
purchased a ticket for Stockton and took the Santa Fe train,
but proceeded no further than Antioch, in Contra Costa
County. Healy accompanied her as far as Point Richmond.

Leaving the train at Antioch, she went to the Arlington Hotel and registered as Mrs. Jones. This was on Sunday. The following day she was placed under arrest. It was further shown in evidence that while McVicar and defendant were in San Francisco the defendant had received from Dr. Dillon a vial filled with half-grain morphine tablets, and that thus the defendant was in possession of the kind of poison which caused McVicar's death. It was also shown that the defendant had represented that McVicar was in very poor health and had not long to live, while, in fact, he was in excellent health. Defendant after her arrest asserted that there was a third person in the room at the time of McVicar's death, a man by the name of Joe Miller; that Miller had gone to San Francisco with her on the train after the death and came across the bay with her to San Francisco from Point Richmond, and then decided not to accompany her further. But it was shown by the witness Healy that it was he only who had accompanied her. The watch and chain of the deceased were in the possession of the defendant at the time of her arrest. From these facts the prosecution argues that the defendant deliberately planned to trick and deceive McVicar, for whom manifestly she could have had no affection, into drawing his money, going with her to Stockton, purchasing and paying for furniture to be shipped to Eugene Le Doux, whom she represented to be her brother-in-law; that then, out of love for Le Doux, and to avoid exposure of her dual life and bigamous relationship with him, it became necessary, as a part of her plot, to kill McVicar as she did. The defense offered to prove that the defendant had been a common prostitute and had been placed in a house of prostitution by McVicar.

During the impanelment of the jury the court ordered a special venire to issue for seventy-five men. The order was directed to the sheriff of the county. (Code Civ. Proc., sec. 226.) Upon the return of the venire the defendant challenged the panel under section 1064 of the Penal Code on account of the bias and prejudice of the sheriff. Evidence was taken upon this, from which it was made clearly to appear that the sheriff had been engaged in gathering evidence for the people, had procured witnesses for the people, had talked with these witnesses, and had thus come to entertain an unqualified opinion that the defendant was guilty. True, the

sheriff testified that, notwithstanding this opinion, he could
try the case "probably as well as any man that would sit upon
the jury," and that he would be governed entirely by the law
and the evidence. But this answer does not to the slightest
extent avoid the effect of his previous declarations. So far
as the challenge for bias is concerned, the sheriff in such a
case is put by the law precisely in the position of a trial juror
(Pen. Code, sec. 1064), and a state of mind which would dis-
qualify a juror equally disqualifies the sheriff. · The posses-
sion of such an opinion absolutely disqualifies, saving only
where the opinion is founded upon public rumor, statements
in public journals, or common notoriety (Pen. Code, sec.
1076), and where, notwithstanding such an opinion so founded,
it is made to appear to the court that the person can and will
act impartially and fairly upon the matter to be submitted to
him. But where the opinion is founded, as is here shown
to be founded, not upon public rumor, or statements in the
public journals, or common notoriety, but upon a direct inves-
tigation of the facts, the disqualification is absolute, and the
testimony of the juror or sheriff that, notwithstanding such
opinion, he could and would .act fairly and impartially, is
utterly without substance or weight. (*People* v. *Landis,* 139
Cal. 429, [73 Pac. 153]; *People* v. *Helm,* 152 Cal. 532, [93
Pac. 99].)

Section 1064 of the Penal Code declares that when the panel
is formed from persons whose names are not drawn as jurors,
a challenge may be taken to the panel on account of any bias
of the officer who summoned them which would be good
ground for challenge to a juror. The sheriff to whom the
order was issued having clearly been shown to be disqualified,
the question is presented, Does the disqualification of the
sheriff extend to his deputy? or, phrasing it differently, Is a
deputy qualified to act where his principal is disqualified?
It is not disputed, and indeed has been decided, that the dep-
uty who actually summons the veniremen under section 1064
may be disqualified and the panel successfully challenged for
such disqualification under the section above cited. (*People*
v. *Ryan,* 108 Cal. 583, [41 Pac. 451].) Moreover, it is unques-
tioned that a disqualification of the deputy does not disqualify
the principal. But, within the range of an extended investi-
gation, we have discovered no authority, and none has been

pointed out to us by the respondent, which holds that the disqualification of the principal does not disqualify his deputies. Yet this is the position which the respondent takes, and which manifestly, from the necessity of the case, it is obliged to take. The contention is that the disqualification under section 1064 is a personal disqualification going only to and extending no further than the person actually summoning the jurymen. But to this position there are insuperable objections. A deputy is merely the agent of his principal. He acts solely by virtue of the power conferred upon his principal, and when the power of the principal is withdrawn, the legal ability of the deputy to act ceases absolutely. The law recognizes deputies only through their principals, and their acts must be done in the name of their principals. (*Joyce* v. *Joyce*, 5 Cal. 449; *Rowley* v. *Howard*, 23 Cal. 402.) The law has never recognized the existence of the power of the deputy to act in a given matter where that same power has been withdrawn or withheld from the principal. The reasons for this are twofold: 1. As a matter of simple logic, since a deputy is but an agent acting solely and exclusively within the power conferred upon the principal, if upon the principal has not been conferred a given power, the attempted act of the deputy is wholly without the principal's authority, and therefore absolutely void. 2. In case of the disqualification of the principal, as by interest, whatever may be the nature of that interest, it would be manifestly unjust to the adverse party if, while the law forbade the sheriff to execute a process for this reason, he could direct the execution by a deputy owing his position and its emoluments to his favor. It is too plain to require discussion that in such case the possibility of wrong or evil sought by the law to be avoided in the disqualification of the principal, would be but perpetuated, if his deputies were allowed to act. So it will be found that in no case where a principal is disqualified does the law make the slightest recognition of the deputies, or ever attempt to empower them to act. Says Blackstone (3 Blackstone's Commentaries 355): "If the sheriff be not an indifferent person; as if he be a party in the suit, or be related by either blood or affinity to either of the parties, he is not then to be trusted to return the jury, but the venire shall be directed to the coroners, who in this, as in many other instances, are the substitutes of the sheriff,

to execute process when he is deemed an improper person."
Sections 4191 and 4192 of the Political Code are but enact-
ments of this common law rule, and, as declared in *People* v.
*Fellows*, 122 Cal. 233, [54 Pac. 830], are to be construed with
section 226 of the Code of Civil Procedure, from which author-
ity to direct the special venire in this case is drawn.

An examination of the authorities will disclose that they are
in unison upon the .proposition. In *Minott* v. *Vineyard*, 11
Iowa, 90, the question arose, and the court declared as follows:
"By section 411 the sheriff is made responsible for the acts
of his deputy, and when the principal is disqualified on ac-
count of interest, prejudice, partiality, consanguinity, or from
being a party to the record, his deputy is also." In *May* v.
*Walters*, 2 McCord, L. (S. C.) 470, the sheriff was disquali-
fied. It was held that the writ should have been served by the
coroner and not by the sheriff's deputy. In *Wood* v. *Carpen-
ter*, 9 N. H. 153, a writ of replevin was directed to the sheriff
or his deputy. The writ was served and returned in the name
of the principal by a deputy. The sheriff was the person sued.
It was held that the disqualification of the principal disquali-
fied the deputy, and that the writ should have been directed
to and served by the coroner. In *Hillyer* v. *Pearson*, 118 Ga.
815, [45 S. E. 701], the sheriff was a party to the suit. It
was declared that where such a disqualification arises it is
mandatory that process shall be directed, not to the sheriff
or his deputies, but to the coroner, and that where process
was directed to the sheriff and his deputies, service of the process
ess was void, even though made by one of the sheriff's depu-
ties. In *Knott* v. *Jarboe*, 58 Ky. 506, where the sheriff was a
party to the suit, though not personally interested in it,
and served process, the supreme court said the act of a
sheriff in executing process in cases in which he is a party
or is interested, is so manifestly inconsistent with public
policy and with the impartial administration of justice that
its performance has always been prohibited, and the court
proceeds: "The sheriff is never allowed to execute his own
process, and so careful is the law in guarding the interest
of the defendant in such a case, not even the deputy is
permitted to execute the process, but it must go to the
coroner, an officer not supposed to be under the influence
of the sheriff. A deputy, it is true, is appointed by the

principal sheriff and regularly acts in the name of the principal, and the principal is liable for any improper conduct of the deputy in the exercise of the office. But the recourse which may be had to the principal may not be adequate to guard the interest of the defendants against the wily acts of an interested deputy." In *McLeod* v. *Harper*, 43 Miss. 42, it is declared that a sheriff is incompetent to serve a process in a suit to which he is a party or in which he is interested, and process addressed to such interested officer will be quashed on timely application to the court. Thus it is seen that all of the authorities agree upon the principle and announce the rule that where the principal is disqualified his deputy is likewise disqualified, and process served under these circumstances is voidable. Therefore, the challenge to the panel should have been allowed.

It has been said that the motive which the people ascribed for the crime and in proof of which they introduced evidence was twofold: 1. Because of defendant's love for Le Doux, with whom the people contend she had contracted a bigamous marriage and, 2. To escape the legal consequences of this bigamous relationship, when it was apparent that that relationship could no longer be concealed from McVicar. As evidence under the first ground, the people introduced certain loving and endearing letters written by defendant to Le Doux. These letters were obtained by a deputy sheriff of Amador County, acting under instructions of the sheriff of San Joaquin County, but without warrant or authority. It appears that this deputy sheriff went to the house where defendant had resided, entered upon the premises and took such letters and papers as he found, without the authority of a search warrant or any other authority, though without the objection of any person present. The only person present, who in any sense could have represented the family, was a minor brother of defendant. It is contended, and indeed it may not be disputed, that such search and seizure were absolutely unwarranted in law, though had under color of authority by an officer of the law. It was in clear violation of the constitutional guaranty, state and federal, of the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures. (Const. Cal., art. I, sec. 19; Const. U. S., art. IV.) But the question here pre-

sented is whether these documents thus improperly obtained under the circumstances indicated, were for that reason not entitled to be received. In *Boyd* v. *United States,* 116 U. S. 616, [6 Sup. Ct. 524], there came under the court's review the provisions of a customs revenue law which authorized a court of the United States, in revenue cases, on motion of the government attorney, to require the defendant or claimant to produce in court his private books, invoices, and papers, or else the allegations of the attorney were to be taken as confessed. It was held that the law does not require actual entry upon the premises and search for and seizure of papers to constitute an unreasonable search and seizure within the meaning of the fourth amendment. A compulsory production of a party's private books and papers to be used against himself or his property in a criminal or penal proceeding or for a forfeiture is within the spirit and meaning of the fifth amendment of the constitution of the United States, which declares that in a criminal case a defendant shall not be compelled to be a witness against himself. It is further said that the seizure or compulsory production of a man's private papers to be used in evidence against him is equivalent to compelling him to be a witness against himself, and, in a prosecution for a crime, penalty, or forfeiture, is equally within the inhibition of the fifth amendment. In the later case of *Adams* v. *New York,* 192 U. S. 585, [24 Sup. Ct. 372], the question arose as to the admissibility in evidence of papers and documents illegally taken from the possession of the defendant. It was there decided that the court considers only the competency of the evidence and not the method by which it was obtained. The rule laid down in 1 Greenleaf, sec. 254, is quoted as the correct rule. It is to the following effect: "It may be mentioned in this place, that though papers and other subjects of evidence may have been illegally taken from the possession of the party against whom they are offered, or otherwise unlawfully obtained, this is no valid objection to their admissibility, if they are pertinent to the issue. The court will not take notice of how they were obtained, whether lawfully or unlawfully, nor will it form an issue to determine that question." In the Adams case it was contended that the incriminatory evidence was illegally obtained because the search warrant under which the officer acted was limited in

character, but the supreme court held that the ground was untenable, saying: "Evidence which is pertinent to the issue is admissible, although it may have been procured in an irregular, or even in an illegal manner." *Boyd* v. *United States,* 116 U. S. 616, [6 Sup. Ct. 524], is reviewed and distinguished, and the decision in the Boyd case, however general its language may be, is limited solely to the instance where the defendant is compelled himself to give evidence against himself, or, where if he did not produce the demanded evidence, it was to be a confession of the truth of the matters charged. It thus appears that whatever wrong may be perpetrated by the invasion of one's constitutional rights against unreasonable search and seizure, the redress for that wrong is not in the exclusion of pertinent evidence which may be obtained by the seizure. The courts, upon the mere question of admitting or rejecting evidence, will not take cognizance of the mode of its production, unless it be shown that the defendant has been compelled himself to give or produce it. So it is said by this court in *People* v. *Alden,* 113 Cal. 264, [45 Pac. 327], "nor does the competency of evidence in any way depend upon the means by which it is brought to the court where it is offered in evidence."

The letters were, therefore, properly admitted in evidence.

The evidence to establish the marriage between defendant and the deceased consisted of declarations by defendant to several people, introductions to many people of the defendant by McVicar as his wife, her acceptance of this role, a telegram from defendant signed by herself as Mrs. McVicar, the repeated registration in hotels by McVicar, in the presence of defendant, of her as his wife, the cohabitation of the two, and their repute as husband and wife. The rule of Lord Mansfield, declared in *Morris* v. *Miller,* 4 Burr. 257, making necessary proof of a marriage in fact, where the charge is bigamy or criminal conversation, has been adopted and consistently adhered to in this state. (*Case* v. *Case,* 17 Cal. 598; *People* v. *Anderson,* 26 Cal. 129; *White* v. *White,* 82 Cal. 427, [23 Pac. 276]; *People* v. *Beavers,* 99 Cal. 289, [33 Pac. 844].) Even the declarations or admissions of a defendant, together with proof of cohabitation and repute, are not sufficient evidence to establish such a criminal charge, without some further proof of an actual marriage. (*People* v. *Beavers,* 99 Cal. 289, [33

Pac. 844].) As tending to prove the marriage in fact, the court admitted in evidence the original of a marriage license issued in the territory of Arizona, authorizing the marriage of the deceased and this defendant under the name of Emma T. Williams, and also the indorsement upon the same instrument of the certificate of the Reverend H. W. Studley, to the effect that at Bisbee, Arizona, he, a minister of the gospel, did join "in the holy bonds of matrimony, according to the laws of this territory, A. N. McVicar of the county of Cochise, territory of Arizona, and Emma T. Williams, county of Cochise, territory of Arizona." The court also admitted in ·evidence a duly certificated and authenticated copy from the records of the county of this license and certificate. It is contended that these papers were improperly admitted, in that there was no independent proof, either of the facts contained in the declaration of the minister, no proof that Studley was an "ordained" minister, and thus authorized under the laws of the territory to join in marriage, and no authentication of the signature of Studley. And it is said, and truly said, that such a marriage certificate is but a private writing, that proof of its execution and truth of its contents should have been made, and that the mere fact that it was a miscellaneous record of the county of Cochise, Arizona, did not prove any of these matters, nor entitle it to admission in evidence without such proof; that the certificate of recordation did not render it admissible, but merely placed the foreign record on the same footing as a domestic, leaving its admissibility depending entirely upon the pertinent rules of evidence. (*Ordway* v. *Conroe,* 4 Wis. 45; *Ferguson* v. *Harwood,* 7 Cranch, 408.) Appellant's position in this respect is absolutely sound. Wherever it is necessary, as in a criminal charge of bigamy or criminal conversation, to prove a marriage in fact as distinguished from a marriage by inference and circumstance, often termed a "common law marriage," it must be shown that the person who solemnized the marriage was one having authority so to do (26 Cyc. 358), and a paper purporting to be a marriage certificate signed by one purporting to be authorized by the laws to solemnize a marriage, is not competent evidence of the marriage unless accompanied by proof that the person making the certificate was in fact authorized to solemnize such marriage. (*State* v. *Horn,* 43 Vt. 21;

*Faustre* v. *Commonwealth,* 92 Ky. 34, [17 S. W. 189].) A marriage certificate does not prove itself. Proof of the signature of the person by whom it purports to have been signed and of his authority to perform the marriage ceremony is necessary. (*Hill* v. *Hill,* 32 Pa. St. 511; *Erwin* v. *English,* 61 Conn. 502, [23 Atl. 753]; *State* v. *Hodgkins,* 19 Me. 155, [36 Am. Dec. 742]; *State* v. *Winkley,* 14 N. H. 480; *People* v. *Crawford,* 62 Hun, 160, [16 N. Y. Supp. 575]; *Finlay* v. *Finlay,* 31 L. J. P. & M. 149; *People* v. *Imes,* 110 Mich. 250, [68 N. W. 157]; *Ellis* v. *Ellis,* 11 Mass. 92.) The record of such an unacknowledged private writing as this is not made evidence of the truth of the recitals contained in it. (*Brown* v. *Griffith,* 70 Cal. 15, [11 Pac. 500]; *Grant* v. *Oliver,* 91 Cal. 163, [27 Pac. 596, 861]; *McCarthy* v. *Hart,* 8 L. C. Rep. 369; *Bowman* v. *Little,* 101 Md. 273, [61 Atl. 1084]; *State* v. *Thompson,* 31 Utah, 228, [87 Pac. 709].) Where a private writing is acknowledged, the certificate thereof becomes *prima facie* evidence of the execution (Code Civ. Proc., sec. 1948), but these writings were not acknowledged. Where not acknowledged, a writing must be proved in one of three ways: By any one who saw the writing executed, or by evidence of the genuineness of the handwriting of the maker, or by a subscribing witness. (Code Civ. Proc., sec. 1940.) Such execution must be shown before it is entitled to admission. (*Sinclaire* v. *Wood,* 3 Cal. 98.) In an effort then to establish a marriage in fact in proof of a criminal charge of bigamy, the evidence here offered, without supporting proof of the facts and the execution, would be clearly inadmissible. But, it is to be remembered that the criminal charge in this case was not bigamy. The evidence was offered as tending to establish a motive, and not to convict the defendant of the crime of bigamy. In establishing the motive, it was not compulsory upon the people to prove that the relation was in fact bigamous. It was sufficient to prove that the defendant believed that it was bigamous, or, in other words, believed that she was in law the wife of McVicar at the time when she subsequently married Le Doux, and at the time when, as alleged, she took McVicar's life. The motive for the crime would be as strong in the one case as in the other. Her conduct would be governed by her *belief* of the fact and not by the *existence* of the fact. To prove her

guilty of bigamy the marriage in fact would have to be shown, as otherwise there could be no second illegal marriage, and, consequently, no *corpus delicti,* no crime. But a motive for the homicide is satisfactorily established by showing the defendant's belief in the existence of a former legal marriage. The truth of the matter upon which that belief is founded becomes an inconsequential matter. Now, in admitting the license and certificate, it was established that the affidavit required by the laws of Arizona for the procurement of a marriage license was made by this defendant and that the signature to this affidavit was her own. It is thus shown that she contemplated contracting a marriage with McVicar in Arizona, and took steps to the end that such marriage might be legally consummated. Additionally it was shown that to the marriage certificate signed by the minister Studley were subscribed "A. N. McVicar, groom, Emma T. Williams, bride," and the signature "Emma T. Williams" was proved to be that of the defendant. Here is furnished some evidence so far as this defendant is concerned, of the truth of the declarations contained in the certificate, and whether or not this marriage to McVicar was in point of law legal, the evidence certainly went to establish that the defendant had contracted a marriage in fact which she believed to be legal, and we hold that by virtue of the proved signature of the defendant to this certificate it was admissible in evidence upon the question of her motive.

As has been stated, the theory of the prosecution was that the defendant killed the deceased because of the love she bore Le Doux and by reason of the fact that McVicar was about to discover that her relations with Le Doux were bigamous. As tending to disprove this theory of motive, the defendant offered to show and endeavored to show that her relations with McVicar were and had been illicit since 1903; that she had been placed in a house of prostitution by McVicar, and that he lived off of her earnings as a common prostitute. Appellant contends that she was entitled to have this evidence go before a jury upon the question of motive; that upon this evidence could be founded a reasonable argument against the prosecution's theory; that it would tend to overthrow any inference of her love for Le Doux; that it was not probable that a man would place his wife in a house of prostitution, while he might be willing that a mere mistress should so live;

that it would be evidence of her love and devotion to McVicar that she would so prostitute herself at his request, and give him the earnings of her shame; that it would tend to establish that her affections were centered rather upon McVicar than upon Le Doux. Clearly we think this evidence was admissible. Its weight, of course, was for the jury. Where marriage is asserted by one party and denied by the other, and where, as here, the motive of a crime is sought to be established before a jury, the whole conduct, life, and character of the parties as affecting this question, is open to inquiry. (*Bell* v. *Clark,* 45 Misc. 272, [92 N. Y. Supp. 163].)

Finally, upon the question of motive, the defendant asked certain instructions as follows:—

"The jury are further especially charged that the presumption of innocence is the only presumption allowable in a criminal case, and it is not overcome by any other presumption. There cannot be two presumptions standing together, one for the guilt and the other for the innocence of the accused. Consequently the presumption of knowledge, the presumption of the continuance of a fact, state or condition shown once to exist, the presumption of the continuance of life, or of marriage, are all overcome by the presumption of innocence.

"You are instructed that the presumption of innocence overcomes all other presumptions, of whatsoever kind or nature.

"If you believe from the evidence that the defendant and Albert N. McVicar were married in September, 1902, at Bisbee, Arizona, and further believe that the defendant married Eugene Le Doux in August, 1905, at Woodland, California, then, in that event, the court instructs you that before you can ascribe to the defendant as a motive for committing the crime charged a desire to avoid any question of a bigamous marriage, or any result therefrom, it must be fully and satisfactorily proved beyond all reasonable doubt that the marriage between Albert N. McVicar and the defendant had never been annulled, and that the defendant knew that it had not been."

These instructions were refused. In support of the refusal it is not asserted that the matter of these instructions was covered by others actually given. It is contended that the court repeatedly instructed upon the presumption of innocence and that this was sufficient. It was not. Since so much of the evidence had been directed to this question of motive,

the defendant was entitled to have the jury instructed with particularity as to the application of the presumption of innocence where conflicting presumptions might be said to arise. The matter is discussed in *Hunter* v. *Hunter,* 111 Cal. 261, [52 Am St. Rep. 180, 43 Pac. 756]. Speaking now without specific reference to the instructions asked, we hold that the defendant was entitled upon request to proper instructions upon this subject-matter. As to instructions actually propounded, the court was justified in its refusal to give them, for they go further than is warranted by the law. The instructions declare that the presumption of innocence is the only presumption allowable in a criminal case, that it is not overcome by any other presumption, but does overcome all other presumptions of whatsoever kind or nature. Such, however, is not the law. All presumptions are evidence. Conclusive presumptions (Code Civ. Proc., secs. 1961, 1962) are not overcome by the presumption of innocence, nor are many disputable presumptions so overcome. Over certain disputable presumptions, though not over all, the presumption of innocence will prevail. Instances of disputable presumptions over which the presumption of innocence will prevail are given in *Hunter* v. *Hunter,* 111 Cal. 261, [52 Am. St. Rep.180, 43 Pac 756]. But, on the other hand, it is a presumption that every person is sane. Insanity may be shown and thus overcome the presumption. Yet, in the absence of evidence, the presumption of innocence would not prevail so as to justify a jury in presuming against sanity. Furthermore, the proposed instructions declare that the prosecution must fully and satisfactorily prove beyond all reasonable doubt that the marriage between McVicar and the defendant had never been annulled, and that the defendant knew it had not been. So far as motive is concerned, to which this evidence was introduced, it was sufficient for the prosecution to satisfy the jury that the defendant believed that a legal marriage between herself and McVicar existed, or, stating it conversely, and more nearly in the language of the proposed instruction, it was only necessary for the prosecution to establish that the defendant believed that she had been legally married to McVicar and that the marriage had not been annulled.

To certain physicians called as expert witnesses, the prosecution addressed the preliminary question whether they had

heard the testimony of certain other witnesses. Upon answering in the affirmative, they were then asked the following question: "Now, doctor, assuming each and all of the facts and circumstances testified to by these gentlemen I have named as true, what in your opinion was the cause of the death of A. N. McVicar, the deceased person mentioned in this case?" The objection of the defendant to this question was overruled. It should have been sustained. The best way to obtain the opinion of an expert witness upon a matter which is the subject of expert evidence, is through the medium of a hypothetical question. Unsatisfactory as that method unquestionably is, it is the least objectionable known to the law. To countenance the practice here adopted would but aggravate existing evils, and destroy whatever value may attach to such evidence. It assumes that every fact which the witness has heard is in his mind, while some may have been forgotten. It allows the expert to assume that unstated evidence upon which he bases his opinion has been proved to his satisfaction, while, to the minds of the jurors, it may not have been proved at all. It permits the expert to base his opinion upon some undeclared fact or set of facts to which he may give great weight, yet which in the minds of the jurors may be entitled to little or no consideration whatever. It makes it impossible for the jury ever to determine upon precisely what facts the expert has based his opinion, and thus makes it forever impossible for them to say what weight should be accorded to that opinion. And in this view it matters not whether the evidence in the case be actually conflicting or not. The vice still remains, if it be said that the evidence is unconflicting, since it is for the jurors alone to say what weight shall be given to this or that or the other evidence tending to establish a given fact. And where the evidence is unconflicting, the jurors may hold that the evidence offered is insufficient to prove some particular fact. So it is said in *People* v. *Akin,* 66 Mich. 475, [11 Am. St. Rep. 512, 33 N. W. 828]: "An expert can never be safely permitted to state that he has heard or read the testimony of a witness or witnesses, and then base his opinion upon such testimony, without stating the particular points of the evidence, the facts upon which he rests his conclusion. There is no reputable authority for any such method of examining an expert witness." In *People* v. *McElvaine,* 121 N. Y. 250, [18

Am. St. Rep. 820, 24 N. E. 465], it is said: "We think it is
not competent in any case to predicate a hypothetical ques-
tion to an expert upon all of the evidence in the case, whether
he has heard it all or not, upon the assumption that he then
recollects it, for it would then be impossible for the jury to
determine the facts upon which the witness based his opinion,
and whether such facts were proved or not."

In thus pointing out what we conceive to be the best method
for obtaining the expert opinion of a witness, we would not
be understood as saying that every departure from that
method involves error, necessitating the reversal of a case.
Cases may arise where the facts upon which the opinion is
sought are simple, salient, and few. If it be made to appear
that the expert has heard the testimony by which those facts
have been presented, it would not necesasrily be held ground
for reversal that he was asked to express his opinion upon
those facts, without a restatement of them. (*Howland* v. *Oak-
land etc. Ry. Co.*, 115 Cal. 487, [47 Pac. 255].) But the
danger in a departure from the approved procedure is that, in
the generality of cases, the facts themselves are in question
and dispute, are numerous and complicated, and, under these
circumstances, injury may be worked to a litigant by an ad-
verse expert opinion so adduced.

We have thus discussed all of the matters which we deem
necessary in contemplation of the new trial which must be
ordered, and for the foregoing reasons the judgment and
order are reversed and the cause is remanded for a new trial.

Lorigan, J., and Melvin, J., concurred.

BEATTY, C. J., concurring.—I concur. There can be no
doubt that the trial judge erred in disallowing the challenge
to the panel of talesmen returned upon the open venire, and
it cannot be held that the failure of the defendant to exercise
all her peremptory challenges was a waiver of her exception
or a conclusive proof that the error was without prejudice,
unless we were willing, which I am not, to lay down a rule of
practice entirely new in this state, and supported by very
meager authority elsewhere, and that in a capital case involv-
ing the life of a woman. Such a rule, moreover, is wholly un-
necessary, since the existing statute affords ample means for

preventing the trouble which has arisen in this case. This open venire was issued, as it is in all such cases, under section 227 of the Code of Civil Procedure, which reads as follows: "When there are not competent jurors enough present to form a panel the court may direct the sheriff, or an elisor chosen by the court, to summon a sufficient number of persons having the qualifications of jurors to complete the panel, from the body of the county, or city and county, and not from the bystanders; and the sheriff or elisor shall summon the number so ordered accordingly and return the names to the court."

The language of this section clearly implies that the judge must, in making the order, determine whether the service of the venire shall be made by the sheriff or by (the coroner) or an elisor. He must, in other words, provide in advance for its service by a competent officer, and the only way to do this is to examine the sheriff and his deputies, and the coroner if necessary, to see that the writ is not issued to a person disqualified to act as a juror in the case. This may always be done in the presence of the defendant and his counsel in a criminal case, and I have no doubt that their waiver at that time of any objection to the sheriff or coroner, or the person named as elisor, by refusing or failing to challenge his competency when given the opportunity, would justify a denial of their challenge after the return of the venire. For it is not true, as contended by counsel, that the statute gives the parties an absolute right to challenge the panel at any time before a juror is sworn. It is true it cannot be taken *after* a juror is sworn—but it does not follow that it may not be waived in a case like the present by the refusal of the opportunity to object when it is offered at the time when, according to the plain intent of the statute (Code Civ. Proc., sec. 227), it is the duty of the court to determine whether the sheriff (or coroner) is competent to act, and if not, to appoint a competent person as elisor.

A rehearing was denied on June 24, 1909, in which the following opinions were delivered:—

THE COURT.—The petition for rehearing is denied. In the petition two matters are pressed upon the attention of the court which merit consideration.

1. It is argued, with much apparent earnestness, that because defendant had not exhausted all of her peremptory challenges at the time of her acceptance of the last juror and the impanelment of the jury, she should not be listened to in the appellate court where she urges the error of the trial judge in overruling her challenge to the panel because of the bias of the sheriff. No one versed in the law can question, or we think does seriously question, the grave error that was committed in overruling defendant's challenge to the panel and in proceeding with the selection of the jury from such venire. But it is said that as the authorities are abundant and the rule well settled to the effect that this court will not review the alleged improper ruling of the trial court upon a challenge interposed to an *individual juror,* if it shall be made to appear that the jury was completed without the exhaustion by the defendant of all peremptory challenges, so the same rule should be applied to a case such as this, where the challenge is to the whole panel; and if it shall be made to appear, as here it does, that a jury was taken while defendant still had unused peremptory challenges in reserve, it should be held as a matter of law that the error of the trial court is conclusively presumed to have been without injury to the defendant. Or, wording it differently, we are asked to say to defendant's counsel: "If you had arbitrarily exhausted your peremptory challenges we would then, for the admittedly erroneous ruling of the trial court in denying your challenge to the panel, have granted your client a new trial. But because you did not thus exhaust your peremptory challenges, we will not consider your objection, and your client must hang." Quite obviously the sole result which could ensue from this would be the execution of this woman under a new ruling upon a question of law. And this ruling would serve only to hang the woman, since in every subsequent case, enlightened by the extraordinary view thus expressed, defendants would exhaust their peremptory challenges and so bring the matter before this court under circumstances which, as has been said, it is conceded would cause a reversal of the case. But the reason why this court refuses so to rule does not rest alone, nor even largely, upon the fact, grave though it be, that the ruling would be the death warrant of a woman who, if her lawyers could have seen into the workings of the mind of the appellate

court, would easily and assuredly have prevented this result by exercising their peremptory challenges—the reason of this court's refusal is based upon the fact that there is no true, substantial analogy between the two classes of cases, and that therefore the application of the rule touching the challenge of an individual juror to the case of a challenge to a panel would be not only without reason in law, but against the reason of the law.

For where a venire has been regularly served by the proper officer, in contemplation of law a panel composed of qualified, dispassionate, fair-minded men is brought into court. If upon examination it shall prove that some one of those men is biased, the taint affects him alone. He may be disposed of by a peremptory challenge. The next juror or jurors called to the box are still presumed to be qualified men legally selected. Therefore if a defendant, while still having peremptory challenges in reserve, shall allow the jury to be completed and then on appeal complain that the court refused to excuse John Roe upon his challenge for bias, the complete answer is that the defendant had it in his power to have relieved himself of the obnoxious juror and refused to do so, and that he shall not therefore be heard to complain of an injury, the evil effects of which he was easily able to have avoided by the exercise of the power of peremptory challenge conferred upon him by law.

But how is it when a just challenge has been interposed to the array, to the whole panel, because of the interest or bias of the party summoning them? There is then before the court not the case of a single juror who may be proved to be disqualified, while his fellows stand qualified; but every man so summoned is obnoxious to the law and is in law a disqualified juror. The question is not then whether an individual juror has successfully passed an examination for actual bias upon *voir dire*, for if the summoning officer has been astute enough and wicked enough, he has procured evil-minded men who can and will do just this thing. But whether he does or does not, the law looks with abhorrence upon the possibility of this being done, and will not subject a defendant to the compulsion of selecting his jurors from men so summoned. In the one case the taint attaches to the individual juror only; in the other it attaches to the whole panel and procedure, and the legal vice is affixed to every juror summoned. What avail then for a

defendant to exhaust his peremptory challenges, knowing, as he must, that he will still be compelled to select his jurymen from men who have been called in against him without warrant of law, and who, for aught that he can tell, may prove secretly more hostile than those who are then in the box? In the case of the challenge to the individual juror, the defendant is called upon to excuse him because of the assurance that the next man is qualified. In the case at bar each and every succeeding man is equally disqualified, and had this defendant exhausted her nine peremptory challenges she would still have been called upon to complete her jury from men all summoned with like illegality who might have been more obnoxious than were those that, under the compulsion of the court's erroneous ruling, she felt obliged to accept. Here then is the broad distinction in the two classes of cases, and here also is the reason why the law will not permit the inquiry to go further than a determination as to whether or not the panel was legally chosen. For, if it was illegally chosen and the defendant compelled, with or without the exhaustion of her peremptory challenges, to select a jury from such a panel, by no conceivable circumstances can such a defendant be said to have been accorded his constitutional right to a fair trial under the laws of his land.

The industry of the state's attorney has resulted in the discovery of but one case which even seemingly bears out his contention. If it fully bore out his contention it would suffice to say that it stands alone against the great weight of contrary adjudication. But it does not so stand. In the case to which we have referred the sheriff had been set aside as disqualified, notwithstanding which order he summoned the jury. The supreme court of Colorado declared that defendant's challenge to the panel should have been sustained for this, unless there had been a waiver of the error, and proceeded briefly to point out the circumstances which, in its view, constituted a waiver. As one of the facts and circumstances, it stated that the defendant did not exhaust his peremptory challenges. But the waiver was not founded upon this circumstance, but upon other facts set forth, to the effect that defendant's counsel expressly stated that the jurors included in the panel were not prejudiced, or illegally drawn or summoned in any other respect than for the reasons specified. Says the supreme court:

"As defendant's counsel admits not only the personal qualifications of the jurors, but that as jurors in all respects they are unobjectionable, it would be idle to quash the panel when no possible injury could result to the defendant from selecting a jury therefrom." (*Boykin* v. *People,* 22 Colo. 496, [45 Pac. 419].) We are not concerned with the soundness of the Colorado court's ruling to the effect that the facts which it presents did constitute a waiver. The one matter which it is desired to point out is that the waiver which the court found did not rest upon a failure of the defendant to exhaust his challenges. None of the cases cited by the Colorado court has any bearing upon the question, and the case itself contains no discussion of the proposition here presented.

· 2. In the concurring opinion of the chief justice, which is hereby adopted, it is pointed out that it is the duty of the trial court to determine whether the summoning officer is qualified or not before ordering the special venire to issue to him. Objection is made that the court is helpless in this regard and has not the power to proceed in the manner indicated. It is said that only when the sheriff and coroner are parties, or when either is a party in a proceeding against the other, or when either of these officers is a party and there is a vacancy in the office of the other, can the court proceed of its own motion, but that in every other case it can proceed only upon a challenge for disqualification supported by affidavit. The restriction thus sought to be imposed upon the general powers of a court of record narrows those powers to the point of absurdity. It would mean that if the judge actually knew that the sheriff was disqualified by consanguinity or interest, he would be compelled to remain silent, issue to him a venire which he knew was to be illegally served, and await the action of somebody before he was able to correct the error. No such shackles as these embarrass a judge in the performance of this duty. It is true that the power of a judge to appoint an elisor is not unlimited and unqualified, but it is equally true that it is his duty to do so in a proper case, and that case may as well be made upon the judge's own initiative as upon that of a party litigant. It is competent and proper for him, with the parties before the court, to interrogate the summoning officer, sheriff, or coroner, to call upon the prosecution or defense so to do, to the end that he may learn at the outset

whether that officer is qualified, and if he be not, then to avoid the unnecessary delay and expense which would be imposed upon the state and upon litigants by placing the venire in disqualified hands.

ANGELLOTTI, J., dissenting.—I dissent from that portion of the foregoing opinion which is numbered "1," and also dissent from the order denying a rehearing.

Assuming that the challenge to the panel was well based, I believe that under the circumstances shown by the record, the objection should be held to have been waived. It appears that five members of the special panel were selected to complete the jury, seven jurors having been selected from the previous panel properly drawn and summoned. To my mind, appellant's objection practically amounts to no more than that these five jurors so selected from the special panel should not have been allowed to act, for the sole reason that they were not properly selected and brought into court. It affirmatively appears, however, that after the challenge to the panel was disallowed, the defendant participated in the examination of the individual jurors composing the same, passed without objection or challenge each of the five jurors ultimately taken from said panel to complete the jury, and allowed such jurors to be sworn to try the case without exercising the right of peremptory challenge as to any of them, although she then had nine unused peremptory challenges. Under these circumstances, I believe that she should be held to have waived her objections so far as these five jurors were concerned. To my mind the principle applicable is that stated in *People* v. *Durrant*, 116 Cal. 196, 197, [48 Pac. 75].

Sloss, J., concurred in the dissenting opinion.

SHAW, J.—I agree that the trial court may forestall a challenge to a special venire of jurors, for bias of the summoning officer, by examining them in the presence of the defendant and his attorney, at the time of ordering the special venire, and allowing the defendant to participate in such examination. In that case, I doubt not the defendant would be deemed to have waived a challenge for any cause covered by such examination, unless he then filed an affidavit alleging

disqualification. I also agree that in many cases it would be a useless formality to require a defendant to exhaust his peremptory challenges in a vain effort to rid himself of jurors whom he really considered objectionable because of the bias of the officer who summoned them.

But I think in the present case, the circumstances show that the proceeding caused no prejudice to any substantial right of the defendant and a practical admission of this fact by the defendant. The only substantial right involved was the right to a trial by a fair, unbiased, disinterested jury of qualified citizens, selected according to the forms of law, by persons without bias toward her. This the record shows she actually had. The fact that the possession of an opinion by the sheriff, who did not summon the jury, works a technical disqualification of the deputies who did perform that service, is not, as I believe, such an important departure from the forms of law as to require a reversal of the case, in the total absence of any claim that it did in fact in anywise affect the character of the jurors selected. For these reasons, and because I considered the other errors alleged to be equally unsubstantial, I did not concur in the original judgment of reversal herein.