[Crim. No. 542.　Third Appellate District.—February 14, 1921.]

THE PEOPLE, Respondent, v. J. H. STENNETT, Appellant.

[1] CRIMINAL LAW—SPECIAL VENIRE OF JURORS—DISQUALIFICATION OF SHERIFF — APPEAL — PRESUMPTION FROM RECORD. — On an appeal from a judgment and an order denying a new trial in a criminal action, it must be presumed that there was a sufficient legal showing to justify the trial court in ordering a special venire of jurors to try the cause, and that upon a like showing it was found that the sheriff was not qualified under the law to summon such venire, where the minutes of the court relating to the orders are not reproduced in the transcript containing the record on appeal, and there is nothing in the transcript disclosing upon what showing the court ordered the special venire or who were present in court at the time the orders were made.

[2] ID.—DISQUALIFICATION OF SHERIFF—PLACING OF JURY IN CHARGE OF DEPUTY—APPEAL—OBJECTION NOT AVAILABLE FOR FIRST TIME. Objection that the court erred, in view of the disqualification of the sheriff, in placing the jury in charge of one of the sheriff's deputies pending its deliberation on a verdict cannot for the first time be raised on appeal.

[3] ID.—WAIVER OF OBJECTION.—Objection to an order placing the jury in charge of a sheriff's deputy, the sheriff himself being disqualified, is waived where not made at the time of the making of the order.

[4] ID.—EVIDENCE—GOOD REPUTATION OF DEFENDANT—SCOPE OF DIRECT AND CROSS EXAMINATION.—Evidence of the good reputation of a

_____

4. Right to cross-examine witness testifying to character, note, 14 L. R. A. (N. S.) 739.

Cross-examination of witness as to character of accused, note, 20 L. R. A. 615.

person on trial for a crime is valuable, as a rule, only in those cases where the guilt of the accused is required to be established, if at all, wholly by means of circumstantial evidence. A witness giving such testimony cannot, on direct examination, detail or refer to specific acts tending to show the defendant's general reputation to be good, but on cross-examination the witness may be asked any fact or circumstance adversely affecting the defendant's personal character.

[5] ID. — PRIOR CONVICTION — CROSS-EXAMINATION OF CHARACTER WITNESS—WAIVER OF CODE PROVISION.—The provision of section 1025 of the Penal Code safeguarding a defendant charged with a prior conviction of a public offense who, upon his arraignment, admits such conviction, against the detrimental consequences which are apt to follow reference thereto in the presence of the jury, is not basal or fundamental, but only a statutory regulation in the trial of such a case, and the defendant by himself opening up the question of his good reputation waives his right to the protection of the code provision, and under such circumstances the district attorney may ask a character witness on cross-examination as to whether he ever heard that the defendant had been previously convicted of a like offense as charged in the information.

[6] ID.—PAST RECORD OF ACCUSED—ARGUMENT TO JURY—LIMITATION. Except for the purpose of showing by argument that the defendant failed to establish a good general reputation, the district attorney is not at liberty to refer in his address to the jury to the past record of the accused.

[7] ID.—EVIDENCE—GENERAL REPUTATION—HEARING OF PREVIOUS DISCUSSION UNNECESSARY.—A witness as to the general reputation of the defendant is not to be refused permission to testify thereto because he had never heard the character of the defendant discussed.

[8] ID. — INSTRUCTION — REASONABLE DOUBT. — An instruction that a reasonable doubt could only arise from the evidence actually produced in the case and that, consequently, such a doubt could not be created through or by want of evidence, involves a correct exposition of the doctrine.

[9] ID.—LARCENY—POSSESSION OF STOLEN PROPERTY—INSTRUCTION.— An instruction in a prosecution for larceny, which, considered as a whole, means that if the property was stolen and in the possession of the defendant immediately after the theft the defendant is required to explain that his possession is innocent to remove the incriminatory effect of the circumstance, is a correct statement of the law.

[10] ID.—CIRCUMSTANTIAL EVIDENCE — INSTRUCTION. — An instruction that when circumstantial evidence is wholly relied upon to prove the defendant's connection with the commission of the crime, any relevant fact or circumstance leading to or surrounding the fact

of the commission of such crime may be shown and considered by the jury, states a commonplace.

[11] ID.—CREDIBILITY OF WITNESSES—INSTRUCTION.—An instruction in the language of section 1847 of the Code of Civil Procedure, providing the manner of considering evidence and testing credibility of witnesses, does not enter the domain of fact, because of a concluding statement that the presumption that a witness speaks the truth may be repelled by the manner in which he testifies, his interests in the case, if any, or his bias or prejudice.

[12] ID.—INTENT TO COMMIT CRIME—INSTRUCTION.—An instruction in the precise language of subdivision 1 of section 7 of the Penal Code, defining the legal meaning of the word "willfully" as applied to the intent with which an act is done or omitted, and including the concluding clause of the section that it does not require any intent to violate law, or to injure another, or to acquire an advantage, is misleading, and should never be given, but is not prejudicially erroneous where the court instructed the jury, in the language of section 20 of such code, that in every crime there must exist a union of act and intent.

[13] ID.—LARCENY—POSSESSION OF STOLEN PROPERTY—CIRCUMSTANCE OF GUILT.—The mere unexplained possession of stolen property is not of itself sufficient to establish the guilt of the possessor thereof, although a circumstance tending to show guilt, to be considered with any other proved facts or circumstances having a like tendency.

[14] ID.—JURY—SPECIAL VENIRE — SUMMONING BY CORONER — PROCEDURE.—No formal showing or procedure is required in the ordering of a special venire of jurors, or in the appointment of the coroner or an elisor to summon such venire because of the disqualification of the sheriff. (On petition for rehearing.)

[15] ID.—TIME OF SUMMONING SPECIAL VENIRE.—While the ordering of a special venire of jurors for a particular case and the appointment of the coroner or an elisor to summon the special jury before the trial has begun constitutes an unusual proceeding, there is no legal objection to such a procedure, when it has been made to appear satisfactorily to the court, howsoever informally, that a special venire will be required in the trial of the case. (On petition for rehearing.)

[16] ID.—DISQUALIFICATION OF SHERIFF—SPECIAL VENIRE — SUMMONS BY CORONER—LACK OF PREJUDICE.—Where the sheriff was a witness against a defendant at two previous trials of the charge stated in the information and was to be a witness in the third trial, he was disqualified, under subdivision 4 of section 602 of the Code of Civil Procedure, from summoning a special venire of jurors,

---

13. Possession of recently stolen property as evidence of larceny, note, 12 L. R. A. (N. S.) 199.

and the action of the court in ordering the coroner to summon the special venire, even if erroneous because of the absence of a formal showing of the disqualification of the sheriff, was not prejudicial but beneficial to the defendant. (On petition for rehearing.)

[17] ID.—SPECIAL VENIRE—SUMMONING BY CORONER—REGULATION BY LEGISLATURE—CONSTITUTIONAL LAW.—The proceeding for the summoning of a special venire of jurors and for the summoning of such a venire by the coroner where the sheriff is disqualified is merely one of procedure, which the legislature may regulate, so long as the constitutional right of the defendant to a trial by a fair and impartial jury is not denied him. (On petition for rehearing.)

[18] ID.—ORDER FOR SPECIAL VENIRE—PRESENCE OF DEFENDANT—PRESUMPTION ON APPEAL.—If the presence of the defendant in court at the time an order is made for a special venire of jurors is essential to the validity of the proceedings, it must be assumed on appeal, upon the presumption of the due regularity of the proceedings, that he was in attendance, in the absence of any affirmative showing to the contrary. (On petition for rehearing.)

[19] ID.—IRREGULARITY IN ORDERING SPECIAL VENIRE — INSUFFICIENT GROUND FOR REVERSAL.—Irregularity in the ordering of a special venire of jurors and directing the summoning of the venire by the coroner involves only a matter of procedure, and is not a sufficient ground for reversal of a conviction, in view of section 4½ of article VI of the constitution, where it appears from an examination of the whole record that there has been no miscarriage of justice. (On petition for rehearing.)

APPEAL from a judgment of the Superior Court of Sutter County and from an order denying a new trial. K. S. Mahon, Judge. Affirmed.

The facts are stated in the opinion of the court.

M. T. Brittan and W. E. Davies for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant was charged by an information filed in the superior court in and for the county of Sutter with a felony, consisting of the crime of petit larceny and a prior conviction of a like offense (Pen. Code, sec. 666), and he brings the case to this court by an appeal from the judgment and the order denying his motion for a new trial.

The property charged to have been stolen by the defendant consisted of automobile tires, three outer casings or tires, and three inner tubes, and were, so it is claimed, taken from the Ford automobile of one A. F. King, a resident of Meridian, Sutter County.

It appears that on the evening of March 5, 1920, between the hours of 8 and 9 o'clock, Raymond King, a brother of the owner of said automobile, was driving in said car on the road running between the city of Marysville and the town of Meridian when, at a point on said road a distance of about a mile and a quarter from the last-named place, a part of the machinery of the car became so disabled that it could not be made to move, and thereupon said Raymond King left the machine on the roadside at said point, where it remained overnight or until the next morning. At the time that said King left the machine, the tires of the car were on the wheels of the car and in good condition. On the following morning, March 6th, between the hours of 8 and 9 o'clock, it was discovered by one of the Kings (the evidence does not show clearly which of the two brothers) that the tires above described had been removed from the wheels of the car and taken away. The larceny was immediately reported to the sheriff of Sutter County, who thereupon, in ferreting out the author of the crime, immediately invoked the assistance of the sheriff of Yuba County, the county seat of said county (the city of Marysville) and the county seat of Sutter County (Yuba City) being only a short distance from each other and divided by the Feather River.

It further appears that the defendant was, at the time the tires were taken, a taxidriver in the city of Marysville, his hours of work at the time in question being in the nighttime, and that, near the hour of 2 o'clock of the morning of the 6th of March, 1920, one Royce Albertson, a resident of the aforesaid town of Meridian, employed the defendant to carry him from Marysville to his (Albertson's) home in said town. Albertson testified that it was about 2 o'clock in the morning when they departed from Marysville; that, while they were going toward Meridian, he saw a car standing on the road about a mile and a quarter east of that town and identified it as the car of A. F. King; that, referring to the stalled car, he remarked to the defendant

that "somebody must have run out of gasoline"; that he observed on the side of the car that he could see while passing it the tires were on the wheels; that they proceeded on their way to Meridian without stopping, arriving at his home about 3 o'clock, or about an hour or possibly a little more from the time they left Marysville; that he paid the defendant for his services and that the latter immediately started on his return to Marysville.

Upon the complaint of A. F. King, a search-warrant was issued by a justice of the peace, authorizing the search of the defendant's house. With this process the sheriff of Sutter and Yuba Counties went to the home of the defendant, in Marysville, arriving there shortly after noon. The defendant was at home and, on seeing the officers and before the object of their visit was made known to him by them, made a remark to the effect that their presence there was rather expected by him. One of the officers proceeded to read the warrant to him, when he interrupted to say that the tires they were looking for were in his house.

Explaining to the officers his possession of the tires, the defendant stated (so the officers testified) that, while he was on his return to Marysville from Meridian, and as he was crossing a long bridge not far distant from Meridian but beyond the point at which King's car was standing, he observed a car, apparently stalled, on the opposite end of the bridge; that, as he approached said car, he noticed that it was a Ford truck, and that when he reached the point where the car was standing, the owner or man in charge of the car saluted him as follows: "Hello, Jack, do you want to buy some tires?" The defendant, so he proceeded with his explanation, asked the man what his trouble was and the latter replied that he could not make the truck work. The defendant thereupon alighted from his car and proceeded to make an inspection of the truck, finally discovering and pointing out the reason the truck refused to move. He found, upon examination, that the truck was loaded with a variety of old artices or junk, among which were about twenty or twenty-five used or second-hand automobile tires. He looked over the tires and picked or selected from the number in the truck the tires referred to and described in the information and therein alleged to be the property of A. F. King. After considerable dickering as to the price,

it was agreed that defendant .could have the tires he had selected for the total sum of $21. Defendant, so he further explained, paid the man $7.50 in cash, with the understanding that the latter would later that day call at defendant's house and receive the balance of the money, and thereupon, placing the tires in his own car, resumed his journey home. He further stated that he waited for some hours for the man to put in an appearance at his home to receive the balance due for the tires, but that, up to the time the officers called at his house, the vendor of the tires had not called for the money.

The above embraces substantially a statement of the testimony presented by the people.

The defendant, testifying for himself, denied seeing or noticing King's car standing on the roadside as he and Albertson were on their way to Meridian; stated that, as they were within a short distance of Meridian, he heard Albertson make a remark about a car being out of gas, but thought that, because his own car was not running smoothly about that time, Albertson was referring to his (defendant's) machine; stated that the side-curtains were up on his car; that Albertson had very little to say while they were moving along, and that from that fact and from the position in which he placed and maintained himself in the seat from the time they left Marysville, he supposed that he (Albertson) was asleep or dozing most of the way; denied seeing King's or any car standing on the roadside when returning to Marysville, and denied taking the tires found in his possession from any car; positively denied that he knew or had any previous acquaintance with the man from whom he claimed to have purchased the tires, and denied telling the officers that the seller of the tires addressed or saluted him as "Jack," and denied that he was so addressed by said seller. He stated that, with the exception that he did not say to the officers or either of them that the vendor called him "Jack," the circumstances under which he met the man who sold him the tires were such as were related by him to the officers and to which the officers testified, as above indicated. He testified that he bought the tires from the man referred to for the sum of $21; that he paid down the sum of $7.50 only and that the vendor was to call at his home in Marysville between the hours of 12

and 2 o'clock of the day the sale was made for the balance of the $21. He explained that the reason he said to the officers when they arrived at his house that he expected that they came for the tires he had purchased from the man on the road was because the vendor had not called for the balance of the purchase price at the hour agreed upon (it was after 1 o'clock P. M. when the officers appeared at defendant's home), and he thereupon became suspicious that the tires had been stolen by the man he bought them of; that he had, before the officers arrived at his home, remarked to his wife that he was afraid that he had bought stolen tires and that he intended to take them to the police office, where he would leave them pending an investigation and determination of whether or not they had been stolen. He further declared that he left Meridian on his return trip to Marysville at about half-past 3 o'clock, arriving at the latter place near the hour of 5 o'clock, and in this he was corroborated by a night-watchman who saw him when he reached Yuba City. He further expressed the opinion or his best judgment, based upon his experience in that particular, that it would have required at least a half an hour for him to remove the tires from the King car, the inference from this statement being that, if he had stopped to remove and take the tires, he would not have arrived at Marysville as early as he and said night-watchman testified that he did.

[1] Taking up in orderly sequence such points urged for a reversal as it is conceived require special consideration, attention first will be given to the proposition, advanced by the defendant, that the trial court erred in denying his challenge to the panel of jurors from which the jury to try his case was selected; and, as to this point, it may in the outset be stated that there is before us no properly authenticated or, indeed, any record upon that particular proceeding authorizing this court to review that question.

It appears that, prior to the day the case had been set for trial, an order was made by the court for the summoning of a special venire of jurors to try the case, and the court ordered the coroner of the county to serve the summons. On the day on which the case was called up for trial, counsel interposed a challenge to the panel, said challenge being

in writing. The grounds thereof were: 1. That there was "a material departure from the forms prescribed (by the Code of Civil Procedure) in respect to the drawing and return of the jury," in that it was not made to appear that the regular panel of jurors had been exhausted at the time the special venire of thirty-five jurors (the number ordered to be summoned by the court) "was ordered by the court to serve on the trial of said defendant," it also being claimed that said order for a special venire was made in the absence of the accused from court when said proceeding was had; 2. That, without any showing of the disqualification of the sheriff of Sutter County to serve and summons the special venire, the court ordered that duty be performed by the coroner of that county.

The minutes of the court relating to the orders in question are not reproduced in the transcript containing the record in these appeals, and there is, consequently, nothing in the transcript disclosing upon what showing, if any, the court ordered a special venire of jurors to be summoned to try the case or who were present in court at the time the order was made. In other words, the record as it is presented to us does not disclose that the sheriff was not legally qualified to serve the process for the special venire, nor does it disclose that the defendant was not present in court when that proceeding was had. The only information regarding the proceeding furnished by the record as we have it here is the written challenge to the panel as returned by the coroner interposed by defendant's counsel and the statement of the district attorney, in reply to the challenge so made, that it was made to appear, before the order for the special venire and the order appointing the coroner to serve the process and so secure the attendance of the special jury were made, that there was on the regular panel in the jury-box an insufficient number of jurors to secure a jury to try the case and that the sheriff was disqualified from serving the process for the special venire. The district attorney did not state whether the defendant was or was not in court when those orders were made, but he did state that the disqualification of the sheriff consisted in the fact that he was a witness for the people against the defendant. These matters are, however, purely extrajudicial or *dehors* the record, and cannot be considered in determining whether

the challenge was or was not well taken. There is before us, therefore, as before stated, no record upon which we may predicate a consideration of the point now in hand, except to rest our conclusion upon the presumption, which must be indulged where the record is silent as to a vital matter of procedure or there is no affirmative showing that those steps which the law requires shall be taken in a case have not been taken, that all that has been legally required to be done was done as required. The rule "is too well settled in this state to require the citation of authorities that where an appellant alleges error it is incumbent upon him to show it affirmatively, and that we will not presume that a trial judge failed to do what the law required him to do, but, in the absence of a showing to the contrary, will presume that he did what he was directed to do." (*People* v. *Russell,* 156 Cal. 450, 457, [105 Pac. 416, 419]. See, also, *People* v. *Yee Foo,* 4 Cal. App. 730, [89 Pac. 450]; *People* v. *Holmes,* 118 Cal. 444, 449, [50 Pac. 675]; *People* v. *Douglass,* 100 Cal. 1, 4, [34 Pac. 490].) In this case, as before stated, the minutes of the court containing a record of the proceedings of which complaint is made by appellant are not in the record here. What, therefore, those minutes show, we do not know, nor have we any authentic way of finding out. The result is that there is here not only no affirmative showing of error or failure by the court to observe the legal requisites for or the essential legal prerequisites to the making of the orders complained of, but the record is absolutely silent as to what took place in court when the orders were made or who were present at that time. We must presume, therefore, that there was a sufficient legal showing to justify the court in ordering a special venire and that, upon a like showing, it found that the sheriff was not qualified under the law to serve the writ. It is, of course, not questioned but that if the sheriff was disqualified to summons the special venire it was not only within the power but the duty of the court to require the coroner to perform that duty, if he was not also disqualified. (Pol. Code, secs. 4172, 4773, subd. 1; Code Civ. Proc., sec. 226.)

[2] In connection with the point above considered, it is argued that, if the sheriff was disqualified, so were his deputies, and, therefore, the court erred in placing the jury

in charge of one of the sheriff's deputies pending its deliberation upon the case. The point was not made in the court below and cannot for the first time be raised on appeal. [3] Indeed, by his failure to object to the order at the time it was made, the defendant waived any objection which might have been interposed to the order placing the jury in charge of the sheriff's deputy. To a precisely similar point, arising under like circumstances, in the case of *People* v. *Nakis,* 184 Cal. 105, [193 Pac. 92], the supreme court replied: "While the deputy was, perhaps, technically disqualified by reason of the admitted disqualification of the sheriff from official participation in the proceedings (*People* v. *Le Doux,* 155 Cal. 535, [102 Pac. 517]), no objection to his appointment was raised at the trial, and, in fact, it was at one time suggested by counsel for defendant that the jury be placed in charge of the sheriff himself. The rule that, by failing to call the court's attention thereto by timely objection at the trial, the defendant in a criminal case may waive his right to object to certain iregularities and errors not basal in their nature has frequently been applied to irregularities in matters concerning the custody and control of the jury. (*People* v. *White,* 20 Cal. App. 156, [128 Pac. 417]; *People* v. *Tarm Poi,* 86 Cal. 225, [24 Pac. 998]; *Price* v. *United States,* 14 App. D. C. 391; *Dreyer* v. *People,* 188 Ill. 40, [58 L. R. A. 869, 58 N. E. 620, 59 N. E. 424]; Id., 187 U. S. 71, [47 L. Ed. 79, 23 Sup. Ct. Rep. 28, see, also, Rose's U. S. Notes].)'' It is further said in the Nakis case: "Moreover, in the instant case, no attempt has been made to demonstrate that any prejudice has resulted from the error. In the absence of an affirmative showing of prejudice to the defendant, a reversal for irregularities in regard to the custody and management of the jury cannot be had. (*People* v. *White, supra; Jarnagin* v. *State,* 18 Tenn. (10 Yerg.) 529; *Speer* v. *State,* 57 Tex. Cr. 297, [123 S. W. 415]; *Galan* v. *State,* 68 Tex. Cr. 200, (150 S. W. 1171]; *Holmes* v. *State,* 70 Tex. Cr. 214, [156 S. W. 1172].)'' In the case at bar there is no affirmative showing that the defendant was prejudiced by the act of the court in committing to the deputy sheriff the custody of the jury pending its determination of the verdict.

Next to be considered is the complaint, that the court erred to the serious detriment of the rights of the accused

by permitting the district attorney, over his objection, to ask on the cross-examination of certain character witnesses introduced by the defendant whether they had ever heard of the latter having been previously convicted of the crime of petit larceny. The witness Hyde, chairman of the board of supervisors of Yuba County, having stated, in reply to a question by an attorney for the defense as to the defendant's general reputation for "truth, honesty, and integrity" in the city of Marysville, where the latter had continuously resided for some fifteen years, that such reputation was good, was asked by the district attorney, on cross-examination, among other like questions, whether he had ever heard that defendant had, previously to the commission of the larceny charged in the information, suffered a conviction of the crime of petit larceny in San Joaquin County, which question the witness answered in the negative.

The prior conviction charged in the information is therein alleged to have taken place "in the justice's court of Elkhorn Township, in the County of San Joaquin," this state. Section 1025 of the Penal Code provides, *inter alia:* "In case the defendant pleads not guilty, and answers that he has suffered the previous conviction (a prior conviction being charged in the accusatory pleading), the charge of the previous conviction must not be read to the jury, nor alluded to on the trial." The point here made is that, by asking the witness Hyde whether he had ever heard of the defendant having been convicted of the crime of petit larceny in San Joaquin County, the district attorney violated the provision of section 1025 of the Penal Code above quoted, the said question to said witness involving, it is argued, an allusion, in the presence of the jury, to the prior conviction charged in the information, the truth of which the defendant had, upon his arraignment, acknowledged.

[4] Evidence of the good reputation of a person on trial for a crime is valuable, as a rule, only in those cases where the guilt of the accused is required to be established, if at all, wholly by means of circumstantial evidence, the theory being that evidence of the good reputation of the defendant for the trait or traits of character necessarily involved in the charge in the community where he has resided for a sufficient period to acquire a general reputation as to such trait or traits may be sufficient to overturn the effect of the

incriminatory circumstances proved against him or so to diminish, as in their application to him, the inculpatory force of such circumstances as that thereby a reasonable doubt of his guilt may be created. Such testimony is, in its nature, of a hearsay species, being based upon what the people of the community generally say of the accused, taken out of the rule of exclusion as to such testimony, however, because of the jealous consideration which the law has for the rights of a citizen when his right to life or liberty is, for some infraction of that self-same law, duly and regularly challenged in a judicial proceeding appropriated by the law to that purpose. Such testimony, while not involving a very high character of exculpatory proof where one is charged with and on trial for a crime, is, nevertheless, of that peculiar character which is likely to have a more far-reaching effect upon the just rights of the parties in the trial than it is actually entitled to exert, unless it is so sifted and its stability so tested before the case is given to the jury as to keep it down to the standard of its real probative function and abstract probative value. The testimony of a witness that, as to certain indicated traits of character, a defendant on trial bears a good reputation generally in the community in which he resides or has resided, necessarily implies that the defendant's personal character, as to those traits, is such that it is most likely he would not commit the crime charged against him, and likewise implies that the witness giving such testimony has never heard anything to the contrary as to such defendant in such community, or has never heard or known of the defendant having been accused of acts which, if committed by him, would not only tend to prove that he was not a man of good general reputation but would stamp him as a man of bad character. It is true that a witness giving such testimony concerning a defendant cannot, on direct examination, detail or refer to specific acts tending to show the defendant's personal character and consequently his general reputation to be good. He may only answer the general question in a general or a categorical way, but, having declared such reputation to be good, it is then within the legal province of the other side (the district attorney in a criminal case) to prosecute an inquiry by cross-examination of the witness as to the basis of his statement that the general

reputation of the defendant is good, and to that end he is entitled to, and should be given, the privilege of asking the witness about any fact or circumstance adversely affecting the defendant's personal character, as, for instance, whether he knew or had ever heard of the defendant being previously convicted of, charged with, or accused of or arrested for other crimes, and this not for the purpose of proving against the accused the commission of other crimes, or merely of prejudicing the defendant in the minds of the jury, but only to weaken or destroy the force of the direct testimony of the witness that the general reputation of the defendant for the traits involved in the inquiry was good and at the same time remove from the case, as far as it may so be done, such testimony as an evidential factor to be considered in determining the question of the guilt or innocence of the defendant. The rule has often been, in different language, so stated and explained. The case of *People* v. *Burke,* 18 Cal. App. 72, 88, 89, [122 Pac. 435], exhaustively considers the rule and, besides an independent discussion and exposition thereof and the principle supporting it, braces the conclusion therein arrived at, and with which the views above expressed harmonize, by a throng of authorities. We know of no exception to that rule, unless it can be successfully maintained that an exception must be recognized in a case to which the provision quoted above from section 1025 of the Penal Code is applicable. But, in view of the above considerations, we can conceive of no sound reason for holding such exception exists or that the legislature could have so intended. The evident intent of said provision is that, where a prior conviction is charged against a defendant and he has, upon his arraignment, admitted such prior conviction, he shall not be prejudiced thereby in the minds of the jury, in its consideration of the case as to the subsequent offense charged, by a gratuitous and an unnecessary allusion thereto at the trial by the district attorney or the court. In the instant case, however, the defendant himself made the question of his general reputation as a man of good character, in so far as the traits or elements of personal character involved in the charge against him are concerned, an issue in the case by voluntarily introducing testimony tending to establish for him a good general reputation for said traits. The issue was presented upon his own initiative,

no attack upon his character, other than that inhering in the charge against him, having previously been made. We may presume that he introduced and pressed that issue with full knowledge that thus he was inviting a full and minute examination by the district attorney into the basis of the testimony of any witness declaring such reputation to be good, and that any such witness, for the purpose only of impeaching the force of his direct testimony, could properly be asked whether he knew of prior specific acts that the defendant had either committed or been accused of which would not comport with the declaration of the witness that the general reputation of the defendant was good.

[5] The provision of the Penal Code safeguarding a defendant charged with a prior conviction of a public offense who, upon his arraignment, admitted such conviction, against the detrimental consequences which are apt to follow reference thereto in the presence of the jury, is not basal or fundamental, but only a statutory regulation in the trial of such a case, and, therefore, it must be held that the defendant in this case, by opening up the question himself of his good reputation, waived his right to the protection of the provision of the Penal Code referred to, in so far as it was necessary for the district attorney to transcend that right in an attempt to destroy the force of the direct testimony of witnesses produced by him to bolster up his personal character for the traits involved in the charge against him. If the protection guaranteed to a defendant by the provision of the Penal Code in question were by the constitution, a different proposition might then be presented in a case such as this; but, as before declared, it is a statutory provision and must be read and understood with the qualification that when the defendant himself voluntarily invites inquiry into his personal character for traits involved in the charge against him, as well as in the offense of which he was previously convicted, as also charged, by introducing testimony tending to establish a good general reputation for such traits, he must be held to have challenged inquiry, in this collateral way, into every wrongful act involving such traits which previously he may have committed or been accused of, for the purpose of destroying the force of the testimony of witnesses testifying to his good general reputation; and it must be held that the operation of the pro-

vision of the Penal Code referred to is, in such case, in the very nature of the situation, for that purpose, suspended or put in abeyance.

The district attorney, in his argument to the jury, referred to the fact that certain of the character witnesses had admitted or testified that they had heard of the defendant having been previously convicted of petit larceny, and also of his having been previously accused of the crime of assault with intent to commit murder, grand larceny, and perjury. It is claimed that, even if the cross-examination (above considered) of the defendant's character witnesses was permissible, still the district attorney went beyond proper and legitimate argument in referring to the prior offense and those of which he had been accused. [6] Except for the purpose of showing by argument that the defendant failed to establish a good general reputation, we think the district attorney was not at liberty to refer in his address to the jury to the past record of the accused; and, as we read that officer's argument, as it is embodied in the transcript, he went no further than that. He was discussing the question of the credibility of the defendant's testimony and comparing it to that of certain witnesses for the prosecution as to matters as to which there was a variance between the testimony of the former and that of the latter, and pointed out, in his own way, how, in his opinion, the defendant not only failed to show a good reputation, but had by his own course at the trial opened the door for the prosecution to show that, as a matter of fact, he had a bad reputation for those traits inhering in the charge set forth in the information. We doubt not that the prosecuting officer thus kept himself within the sphere of legitimate argument.

There is a large number of other assignments of error, involving rulings of the court on evidence, but all of these, with the exception of one, to which we will next give special notice, we have found, upon examination, to possess no substantial merit, and, therefore, require no specific consideration herein.

[7] The witness Johnson, for the defendant, was asked if he knew the general reputation of the accused, in Marysville and vicinity, "for truth, honesty and integrity," to which question he replied in the affirmative. When asked

51 Cal. App.—25

whether it was good or bad the district attorney interposed
before an answer was returned to the question and asked
permission to ask the witness some preliminary questions
to ascertain whether he did know such general reputation
and was qualified to testify to it. The district attorney
brought out the fact from the witness that he had never,
previously to the time of the filing of the charges against
defendant of stealing the tires described in the information,
heard the latter's reputation for the traits mentioned
discussed, and the court thereupon ruled that the witness
was incompetent to give testimony as to the general reputa-
tion of the defendant, and the witness did not answer the
question whether such reputation was good or bad. It is
argued that the ruling was erroneous and prejudicial. We
think the witness, having said that he knew the defendant's
general reputation, etc., should have been permitted, also,
to say whether it was good or bad. It does not necessarily
follow from the fact that a person has not heard another's
character discussed in the community in which he has re-
sided for a number of years that he does not know or cannot
say that he knows such other person's general reputation
in such community for the traits of character germane to
such inquiry. The fact that no reproach has ever been
heard or known to have been uttered against the character
of a person generally known in a community in which he
has for many years resided may be the very highest evidence
that the general reputation of such person in such com-
munity is good. Generally speaking, it is the man addicted
to the commission of bad or wrongful acts whose character
is generally discussed by those who know him, while, on
the other hand, a person who has lived an uniformly ex-
emplary life in all respects is one whose character is not
often spoken of. But be that as it may, as stated, the court
should have allowed Johnson to answer the question whether
the defendant's general reputation in Marysville was good
or bad (*First Nat. Bank* v. *Wolff*, 79 Cal. 69, [21 Pac.
551, 748]), and the fact that the witness had never heard
defendant's reputation or character discussed could have been
brought out by the people as a fact to be considered by the
jury in determining whether it affected the weight of the
witness' testimony, and, if so, to what extent. We are, how-
ever, firmly of the opinion that, since there were several

other witnesses who testified to the good general reputation of the defendant, which would make Johnson's testimony, if allowed, merely cumulative as to that fact, the action of the court with respect to said witness' testimony could not have had the effect of prejudicing the substantial rights of the accused. Moreover, as we shall later particularly point out and, indeed, as we think the above recital of the facts shows, the evidence of the defendant's guilt is such that it cannot justly be held that the error referred to has resulted in a miscarriage of justice. (Const., art. VI, sec. 4½; *Vallejo etc. R. R. Co.* v. *Reed Orchard Co.,* 169 Cal. 545, [147 Pac. 238].)

[8] The instruction given in this case, defining and amplifying the doctrine of reasonable doubt, is criticised by the defendant. The criticism is that the court told the jury that a reasonable doubt could only arise from the evidence actually produced in the case and that, consequently, such a doubt could not be created through or by a want of evidence. But an instruction in precisely the same language as the instruction here assailed was critically considered and sustained as involving a correct exposition of the doctrine in *People* v. *Del Cerro,* 9 Cal. App. 764, 771, [100 Pac. 887], the supreme court having denied an application for the hearing of the case by it after decision by this court, and we here refer to that case for an answer to the argument here against the soundness of the instruction.

[9] Instruction number 7, after stating that while the mere unexplained possession of stolen property is not of itself sufficient to justify a conviction, such possession is nevertheless a circumstance which may be considered in connection with other testimony in determining the question of the guilt of the accused, declared that there must be, in addition to the proof of possession, proof of corroborating circumstances tending in themselves to establish guilt. This language in the instruction is followed by a statement of specific circumstances, the existence of which could well be inferred from the evidence in this case, which, it was stated, could be considered as corroborative of the circumstance of the unexplained possession of the stolen property, and the instruction concludes as follows: *"and any and all other acts or circumstances tending to show the guilt of the accused."*

The criticism of the instruction is directly aimed at the italicized language, and of it it is said that in effect it invited consideration by the jury of facts, acts, and circumstances not brought out by the evidence. The criticism is unjust. The instruction must be read and considered in its entirety and in connection with and by the light of the general charge of the court, and as so considered, as obviously the jury considered it, the language criticised plainly means such other acts or circumstances as were shown by the evidence as tending to show the guilt of the accused. The court, in a preceding instruction, told the jury that the question as to what facts had been proved and whether the defendant was or was not guilty must be determined by them "from a consideration of the testimony admitted at the trial," and the language of the instruction condemned by the defendant must be, and undoubtedly by the jury was, considered as referring only to acts or circumstances shown by "the testimony admitted at the trial." The above instruction is further assailed because it stated that "the defendant is bound to explain the innocent possession in order to remove the effect of the possession as a circumstance to be considered in connection with other suspicious facts, if the evidence discloses any such." This language of the instruction followed the statement in the same instruction that "if the jury believe the property was stolen, and was seen in the possession of the defendant shortly after being stolen," etc. Considered as a whole, we understand the instruction merely to mean that, if the property was stolen and in the possession of the defendant immediately after it was stolen, to remove the incriminatory effect of those circumstances as against him, he would be required to explain that his possession was innocent or honestly brought about. As so understood, we can see nothing wrong in the instruction. Indeed, if it be the law, as undoubtedly it is, that the unexplained possession of stolen property soon after it is stolen, while in itself not sufficient to convict, may nevertheless be regarded as an incriminatory circumstance against the accused, then, quite logically, it follows that, to remove the incriminatory effect of the circumstance as against him, it is incumbent upon the accused to explain that his possession was innocent.

[10] We have examined instructions numbers 13 and 14 and have found no substantial objection to them. Number 13 simply means that, when circumstantial evidence is wholly relied upon to prove the defendant's connection with the commission of the crime, any relevant fact or circumstance leading to or surrounding the fact of the commission of such crime may be shown and considered by the jury. The instruction, it may be said, is not in graceful language, but at the most it hardly more than states a commonplace. Number 14 fairly well explains the distinction between direct and circumstantial evidence, correctly declares that guilt may be established by means of either, and emphasizes the obvious proposition that, to justify a conviction on circumstantial evidence, there must be produced in the minds of the jury the same degree of certainty as to the defendant's guilt as is required where direct evidence is relied upon.

[11] Instruction number 6 very clearly explained how or in what manner the jury should consider the evidence and the testimony of any witness testifying in the case, also explaining the tests whereby the credibility of any witness might be determined by the jury, and concludes with the statement that a witness is presumed to speak the truth, that such presumption may be repelled by the manner in which he testifies, "his interest in the case, if any, or his bias, or prejudice, if any," etc. The words in quotation constitute the foundation for the contention by defendant that the instruction enters upon the domain of fact. With the exception of those words, the instruction is in the language of section 1847 of the Code of Civil Procedure, but the instruction, as so given, is general or abstract and refers to no particular witness and, with the added words indicated, has often been given and very properly held not to be obnoxious to the objection registered against it here. (See *People* v. *Amaya,* 134 Cal. 531, 546, [66 Pac. 794]; *People* v. *Sheffield,* 9 Cal. App. 130, [98 Pac. 67].)

[12] Instruction number 10 is in the precise language of subdivision 1 of section 7 of the Penal Code, defining the legal meaning of the word "willfully" as applied to the intent with which an act is done or omitted, and includes the following language, which is that of the con-

cluding clause of said section: "It does not require any intent to violate law, or to injure another, or to acquire an advantage." This language, it is claimed, states a proposition contradictory to the rule, stated by the court to the jury in a preceding part of its charge, that "in every crime or public offense there must exist a union, or joint operation of act and intent, or criminal negligence." (Pen. Code, sec. 20.) The instruction, with the language complained of embodied therein, is really misleading and should never be given; but the instruction involves only an abstract statement of a rule of law as it is declared by the legislature, and, in view of the fact that the evidence is amply sufficient to warrant the inference that the defendant took the property in question with the intent to steal it (which, it seems to us, in a sense involves an intent to violate the law), and in view of the further consideration that the court instructed the jury in the language of section 20 of the Penal Code, we think it is very clear that the defendant could have suffered no prejudice from said instruction, and we so hold.

The last point which it is conceived necessary to consider is that the evidence is insufficient to support the verdict. We think the recital of the facts in the outset of this opinion is itself sufficient to refute this contention.

[13] It is true, as has been above intimated, that the mere unexplained possession of stolen property is not of itself sufficient to establish the guilt of the possessor thereof, although a circumstance tending to show guilt, to be considered with any other proved facts or circumstances having a like tendency. In this case, however, there are many circumstances, other than the possession of the stolen property by the defendant, which are strongly indicative of his guilt and, with the circumstance of possession, sufficient, if the jury believed them to be true, to sustain the conclusion that the defendant committed the larceny charged. His alleged purchase of the tires under the circumstances claimed and detailed by him; his selection, in the night-time, out of twenty or twenty-five tires, the very tires stolen from King's car; the fact that the alleged vendor was willing to let him (a perfect stranger, he testified) have tires sold for $21 upon payment down of only $7.50, with the understanding that such vendor would call at his (defendant's)

house for the balance of the purchase price later that day; the failure of the alleged seller to call at the appointed time for such balance; the statement of the officers that the defendant told them that, upon meeting the alleged seller in the dark at the end of the bridge, the latter familiarly addressed him as "Jack," and the further fact that defendant on the stand declared that he made no such statement to the officers; the fact that defendant passed and was near the point on the roadside where the King car stood; these and other circumstances which it is not necessary to restate were matters for the jury to consider in connection with the fact of the defendant's possession of the stolen property, and all, it must be admitted, are of the most incriminatory nature as against the accused.

We have examined and considered such of the points, of which there are many, as we have conceived called for special notice with a minuteness which the briefs and the importance of said points appear to us to have demanded, and our conclusion is, as must be apparent from the foregoing discussion, that the result reached below should not be disturbed.

The judgment and the order are, accordingly, affirmed.

Prewett, P. J., *pro tem.*, and Burnett, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 15, 1921, and the following opinion then rendered thereon:

HART, J.—The defendant asks for a rehearing of his appeal, basing his petition on the sole ground that this court, in treating the points urged by him that error was made in the ordering of a special venire of jurymen to try his case, and in the making of the order, because of the disqualification of the sheriff, that the coroner serve the process for the special jury, grounded its conclusion thereon upon a misapprehension of the record. In the original opinion it was stated: "The minutes of the court relating to the orders in question are not reproduced in the transcript containing the record in these appeals, and there is, consequently, nothing in the transcript disclosing upon what showing, if any, the court ordered a special

venire of jurors to be summoned to try the case or who were present in court at the time the order was made." Upon a re-examination of the transcript we find that we were mistaken in declaring that the minutes pertaining to the orders in question were not contained in the transcript, that portion of the transcript having in some way been overlooked by the writer of the opinion in the original investigation.

It appears from the transcript that, prior to the day previously fixed for the trial of the accused, the district attorney stated in open court that there were remaining but twenty-eight names in the jury-box of jurors summoned on the regular panel, "some of whom are not now living in the county," and others of whom "had been drawn and examined in the two previous trials of said case [two previous mistrials of the defendant on the charge stated in the information having been had], others legally disqualified on account of deafness, and not being able to understand the English language, and at least two of them mothers with infant children at their breasts"; that the sheriff of the county, who had testified at the two previous trials as a witness to material and incriminating facts against the defendant, would be called as a witness against the defendant again at the ensuing trial, and asked that, in view of the disqualification of the sheriff to summon a special panel, the coroner of Sutter County be appointed as an elisor to summon a special jury to try the case. It further likewise appears: "The court met at 2 P. M. Present: Hon. K. S. Mahon, Judge; Albert Brown, Clerk; the District Attorney and the Sheriff."

It does not appear from the minutes whether the defendant was or was not present.

As shown in the original opinion, the attorney for the defendant, on the day that the case was called for trial, interposed a challenge to the panel on the grounds that the order for the special venire was made in the absence of a showing that the regular panel had been exhausted or so reduced numerically as to require a special venire and that the order appointing the coroner to perform the duty of summoning the special venire was made in the absence of a showing of the sheriff's disqualification to serve the process for the special venire. It is also argued in the

briefs filed on behalf of defendant that it does not appear
from the minutes that the defendant was present when the
said orders were made.    There was no other showing made
by the defendant on the challenge than that involved in
the mere written challenge itself.

We are still of the opinion that there is not before us
a record upon the proceedings resulting in the making
of the orders complained of which warrants a review of
the objections to the action of the court with regard to
the matters referred to.

[14] In the first place, we remark that we know of no
provision of law prescribing a particular or a formal pro-
cedure whereby a special venire of jurors shall be ordered,
nor do we know of any provision for such procedure in
the appointment of the coroner or an elisor to summons a
special venire of jurors because of the disqualification of
the sheriff to perform that duty.    Ordinarily, the ordering
of a special venire in a particular case is done in the course
of the trial—that is, of course, before a jury to try the
cause has been completed and the regular panel has been
exhausted without securing a jury.    And it is generally
then, where it transpires that the sheriff is for any legal
reason disqualified from summoning the special veniremen,
that the court orders either the coroner or an elisor to
serve the process.    We think we can safely say that in
almost all such cases the court acts, not upon any formal
showing, but upon its own knowledge of the situation with
respect to the trial.    [15] It is to be conceded that (so
far as the writer of this opinion knows) the ordering of
a special venire for a particular case and the appointment
of the coroner or an elisor to summons the special jury
before the trial has begun constitute an unusual proceed-
ing; but we know of no legal objection to it.    In such a
case, however, it seems to us that when it has been made
to appear satisfactorily to the court, howsoever informally
the showing may be (there being, as stated, no formal pro-
cedure prescribed for conducting such a proceeding), that
a special venire will be required in a case not yet on
trial, but about to come to trial, and that the sheriff
is legally disqualified from summoning the special jury, the
court, exercising a lawful jurisdiction and power, is then
authorized to make the order for the special venire and

an order naming the coroner or appointing an elisor to serve the process for the special veniremen. In fact, we know of no reason why the court may not in such a case act largely, if not altogether, upon its own knowledge of the situation, and, as it undoubtedly may in the case where the trial is actually on, make the orders *sua sponte.* Indeed, if the court was invested with knowledge of the fact that the sheriff was disqualified from summoning the special venire because of bias and prejudice against the defendant in a criminal case, it would be its duty, as a matter of common justice, to commit the duty of serving the process for a special jury to act in the defendant's case to some other proper person. [16] The minutes of the court and, in fact, the record of the trial, show that the sheriff was a witness against the defendant at two previous trials of the charge stated in the information and that he was to be and was a witness against the accused in the third trial, which resulted in a verdict of guilty, and in all the trials gave testimony tending strongly to show the defendant's guilt. Clearly, then, it was made to appear that the sheriff was disqualified from serving the process for the special jury (Code Civ. Proc., sec. 602, subd. 4; *People v. Le Doux,* 155 Cal. 535, 542, [102 Pac. 517]), and if that officer had summoned the special venire, a challenge to the panel could have been successfully interposed on the ground of the bias of the sheriff (Pen. Code, sec. 1064; *People v. Le Doux, supra*), and, obviously, it was in the interest of and for the special benefit of the defendant, and in his interest and for his benefit alone, that the order appointing the coroner to take the place of the sheriff as the server of the special jury process was made—a duty which conferred upon the coroner, as it is by law conferred upon the sheriff, where he summons a special venire, the power of *selecting* the persons to be returned under the process; and so it is to be said that, even if there was an irregularity in the proceedings culminating in the orders complained of, particularly that devolving upon the coroner the duty of serving the special process, in point of fact the defendant could not have been prejudiced by that order or the manner in which it was made, unless it transpired that the coroner, too, was biased and prejudiced against the defendant. There was, though, no showing that the coroner

was biased against the accused or that he was disqualified
legally from serving the summons. In fact, the defendant
made no extrinsic showing whatsoever in support of his
challenge to the panel. In other words, the defendant did
not show, by affidavits or otherwise, except by reference to
the minutes of the court, what actually took place when
the orders were made, if, in fact, anything more than
said minutes disclose did then take place.

[17] The whole proceeding involved in this discussion
was merely one of procedure. The constitution, it is true,
guarantees the right of trial by jury as that institution
was known to the common law, and thus the right inheres
in all criminal cases amounting to felonies. That right can-
not, of course, be denied to a defendant in such a case by
legislative fiat, nor can the legislature by the procedure
it adopts for the enforcement of the right impair its ex-
ercise in any degree. But the legislature may regulate the
procedure by which the right is enforced or exercised. All
that a defendant in a criminal or a litigant in a civil
case is entitled to, so far as that right is concerned, is to
a trial by a fair and impartial jury. He is entitled to no
more—he cannot be denied any less. The provisions of the
law authorizing the selection of special venires and the
appointment of the coroner or an elisor to summons such
special veniremen are designed to preserve to litigants in
civil and defendants in criminal cases the full efficacy of
the constitutional guaranty of a jury trial. Those provi-
sions and the method of enforcing them are, as stated,
purely procedural in their nature, and this the legislature
is legally competent to regulate, and has so regulated it as
not to impinge in the least upon the basal right. It is
plainly manifest in this case that the action of the court
in the proceeding with which we are here concerned, par-
ticularly in the matter of committing to the coroner of the
county the duty of summoning the special jury, was, as
before stated, not only in the interest of justice, but for
the sole benefit of the defendant, who was entitled to have
the jury by which he was to be tried composed of persons
fair and impartial as to his case. He was, therefore, en-
titled, not only as a matter of common justice, but by the
express mandate of the law, to have the special jury *selected*
by a person not directly interested in the prosecution of the

case against him—not by one who the law declares is to be regarded as entertaining bias and prejudice against him. And the fact that the court, having knowledge of the situation, and to the end that the party serving the process for the special venire would be wholly disinterested in the case and not biased and prejudiced against the accused and that the defendant might be given that fair and impartial trial to which he was entitled, ''took time by the forelock'' and in advance of the day fixed for the trial provided for the special jury and the summoning thereof in the manner indicated, cannot be said to be more than an irregularity in procedure, even if that, but if that, the only effect thereof was, without detrimentally affecting the substantial rights of the accused, to save the time, trouble, and delay which would necessarily have attended similar action after the trial had been begun and while in progress; for safely may we venture the conjecture that had the sheriff instead of the coroner selected the special venire, either before or in the course of the trial, the defendant, upon the return of the process by that official, would have challenged the panel on the ground of the bias of the sheriff and, of course, under the circumstances of this case as revealed by the record of the trial, the court would have been required to sustain the challenge.

Nor can it avail the defendant anything by a consideration of the points under discussion upon the theory, as assumed by him, that, in order to clothe the court with authority to make the orders in question it was necessary that a showing be made by affidavits or some other mode of proof of the existence of the conditions upon which only may a special venire be ordered and the coroner designated to serve the process for such venire because of the disqualification of the sheriff. If such a showing be required in such cases, then the reply to the defendant's position that the court was without authority to make said orders is, as before pointed out, that the record does not affirmatively disclose or show whether any other showing than that indicated by the minutes above referred to was or was not made. The transcript does not contain a statement that the minutes contained and revealed the only showing that was made in the proceedings eventuating in the making of the orders. It follows, then, that it must be presumed,

as we declared in the original opinion, that all the legal steps essential to the giving the court the right to exercise and apply its jurisdiction to order a special venire and to find that the sheriff was disqualified and thereupon to appoint the coroner to summons the special venire were regularly taken. The presumptions applicable to this situation (we are now merely assuming that the position of defendant as to the showing that should be made in such matters is sound) are that official duty has been regularly performed, and that a court or judge, acting as such, was regularly acting in the lawful exercise of its or his jurisdiction and of the power vested by law in it or him as to any particular proceeding. (Code Civ. Proc., sec. 1963, subds. 15, 16.) In other words, if the law contemplates that there must be, before the court is authorized to order a special venire and to designate the coroner as the server of the process for such venire in the place of the sheriff, some showing by way of proof of the existence of conditions justifying the making of such orders, then, in the absence of an affirmative statement in the record that the minutes of the proceeding resulting in the making of the orders contain all the showing that was made and upon which the orders were predicated, the presumption would be that whatever showing was required by the law ·to be made as a prerequisite to the making of the orders was regularly and duly made.

[18] As to the declaration of the defendant that he was not present in court when said orders were made and that, consequently, the orders were void, we first desire to be understood as not deciding that his presence at the time mentioned was either necessary or unnecessary. It is to be suggested that parties to civil actions or the defendants in criminal cases are never present, or by law required to be present, when a regular panel of jurors is drawn, and we mention this only for the purpose of showing that the legislature never regarded the presence of the parties litigant in court when that proceeding is carried on as important or as affecting their substantial rights at the trial. Generally, however, when a special venire is ordered the trial is in progress, and it may be that the action of the court in ordering a special venire and in

appointing the coroner to serve the process for the special jury, where it appears that the sheriff is disqualified from performing that service, is to be regarded as a part of the trial. But, however that may all be, and without deciding whether the defendant should or should not be present in court when such a proceeding is had, the reply to the point predicated upon that proposition in this case is to be found in what we have above had to say regarding the ordering of a special venire and the appointment of the coroner to summon it, since there is no affirmative showing in the record that the defendant was not in court at the time referred to. The record neither shows that he was then present nor shows that he was not present in court. Therefore, if his presence in court at that time was essential to the validity of the proceedings, upon the presumption of the due regularity of the proceedings it must be assumed, in the absence of an affirmative showing to the contrary, that he was present in court when the orders were made.

[19] We may suggest, in conclusion, that assuming that the proceedings complained of were irregular, we can conceive of no reason why section 4½ of article VI of the constitution is not applicable, the said proceedings involving only a matter of procedure and it appearing to our minds, after an examination of the entire record, including the evidence, that a miscarriage of justice has not resulted therefrom.

The petition for rehearing is denied.

Prewett, P. J., *pro tem.*, and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 14, 1921.

All the Justices concurred.